The COOL MOOSE PARTY, et al., Plaintiffs, Appellants,

v.

STATE OF RHODE ISLAND, et al., Defendants, Appellees.

Nos. 98–1874, 98–1875.

United States Court of Appeals, First Circuit.

Heard March 5, 1999.

Decided Aug. 25, 1999.

Robert J. Healey, Jr., for The Cool Moose Party and for himself, individually.

Thomas A. Palombo, Special Assistant Attorney General and Katherine A. Merolla, with whom Robert E. Craven was on brief for the State of Rhode Island, the Secretary of State for the State of Rhode Island, and The Rhode Island Board of Elections.

Before STAHL, Circuit Judge, MAGILL,* Senior Circuit Judge, and LIPEZ, Circuit Judge.

LIPEZ, Circuit Judge.

In September 1996, the Cool Moose Party ("CMP"), a Rhode Island political party, and Robert J. Healey, Jr. individually and in his capacity as CMP's chairperson (referred to collectively herein as "CMP"), filed suit in federal district court pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief from various provisions of Rhode Island's primary election laws, R.I. Gen. Laws §§ 17–15–1 to 17–15–44. After the parties filed cross-motions for summary judgment on a stipulated record, the district court ruled, *inter alia,* that R.I. Gen. Laws § 17–15–6, which requires political parties to select their nominees by means of primary election, is constitutional; and that R.I. Gen. Laws § 17–15–24, which prohibits members of one political party from voting in another party's primary, is unconstitutional to the extent that it prohibits such voters from participating in a party primary when the bylaws of that party would permit such

participation. Both parties now appeal the adverse judgments against them. We affirm.

## The Questions Presented

We note at the outset that CMP's challenges to Rhode Island's primary election statutes both in the district court and on appeal contain ambiguities which limit our ability to address its contentions and restrict the scope of our analysis. As the district court observed, CMP's pleadings and arguments "are difficult to decipher and do not clearly state the precise nature of the constitutional violations alleged." *Cool Moose Party v. Rhode Island,* 6 F.Supp.2d 116, 119 (D.R.I.1998). Notwithstanding this lack of clarity, the district court identified five issues that appeared to be raised by CMP, *see id.,* two of which are appealed here:[1]

(1) Whether R.I. Gen. Laws § 17–15–6, which requires political parties to select their nominees by means of primary elections, violates CMP members' right to freedom of association by preventing them from selecting candidates at a caucus open only to CMP members.

(2) Whether R.I. Gen. Laws § 17–15–24, which prohibits members of one political party from voting in another party's primary, violates the plaintiffs' right to freedom of association because it prevents CMP from allowing members of other parties to participate in the selection of CMP candidates.

*Id.* On appeal the parties apparently agree with the district court's characterization of the issues presented, and we proceed accordingly. We review a district court's grant of summary judgment de novo. *See Lennon v. Rubin,* 166 F.3d 6, 8 (1st Cir. 1999).

---

* Of the Eighth Circuit, sitting by designation.

1. The district court granted summary judgment to the State on the three other claims, *see Cool Moose Party v. Rhode Island,* 6 F.Supp.2d 116, 122–25 (D.R.I.1998), and CMP does not appeal those rulings.

## The Constitutional Background

█ The freedom to associate with others for the advancement of political beliefs and ideas is a form of "orderly group activity" protected by the First and Fourteenth Amendments, and "[t]he right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Kusper v. Pontikes*, 414 U.S. 51, 56–57, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *see Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986); *Elrod v. Burns*, 427 U.S. 347, 356, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *NAACP v. Alabama ex. rel. Patterson*, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Those associational rights, however, "are necessarily subject to qualification if elections are to be run fairly and effectively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986); *see Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 117 S.Ct. 1364, 1369–70, 137 L.Ed.2d 589 (1997); *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Thus, states may enact laws that are necessary to ensure the integrity, fairness, and honesty of the election process, *see Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 231, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989), even though such laws may abridge a party's associational rights by interfering with its internal' affairs or its ability to garner support and members, *see, e.g., Dunn v. Blumstein*, 405 U.S. 330, 343–44, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (residence requirement); *Oregon v. Mitchell*, 400 U.S. 112, 118, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (age minimum); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 625, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (citizenship requirement).

█ Faced with the inherent tension between a political party's right of association and a state's power to regulate elections, the Supreme Court has endorsed a flexible standard of review applicable to a challenged provision corresponding roughly to the degree to which the provision affects First and Fourteenth Amendment rights:

> When deciding whether a state election law violates the First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.

*Timmons*, 117 S.Ct. at 1370 (internal quotation marks and citations omitted); *see also Werme v. Merrill*, 84 F.3d 479, 483 (1st Cir.1996).[2] Under this formulation, "no bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms." *Timmons*, 117 S.Ct. at 1370.

## The Primary Requirement

CMP contends that R.I. Gen. Laws § 17–15–6, which requires that parties se-

---

**2.** We note that the parties seem to either ignore or misunderstand the appropriate standard of review. In defending the constitutionality of the challenged provisions, the State repeatedly cites article 1, section 4, clause 1 of the Constitution, which permits states to regulate the "Time, Places and Manner" of elections. However, "[a] State's broad power to regulate the time, place and manner of elections 'does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens.'" *Eu*, 489 U.S. at 222, 109 S.Ct. 1013 (quoting *Tashjian*, 479 U.S. at 217, 107 S.Ct. 544). On the other hand, contrary to CMP's repeated assertions, any abridgement of a political party's associational rights does not automatically trigger strict scrutiny review.

lect their nominees by primary election rather than by party convention or caucus, is unconstitutional.[3] Although we have considerable difficulty deciphering CMP's argument, CMP on appeal appears to accept the proposition that states may require parties to select their nominees by primary election without violating the parties' First Amendment associational rights.[4] *See, e.g.,* Reply Br. at 6. Rather, CMP now makes a vague equal protection challenge to the primary requirement, contending that although Rhode Island "may mandate a primary, ... it must not have disparate outcomes as to major or minor parties." *Id.* In particular, CMP argues that primary elections have a "disproportionate ... impact [on small parties] in terms of raiding."[5] In other words, CMP argues that its small membership could more easily be overcome by a determined group of raiders than could a larger, more established party, and that this "disproportionate impact" renders the primary requirement unconstitutional.

■ Whatever the merits of CMP's "disparate impact" argument may be, the district court did not address it, and for good reason. There is no indication in the record that CMP, in challenging R.I. Gen. Laws § 17–15–6 before the district court, ever raised its novel "disparate impact" argument with even minimal clarity. Although the confused pleadings below suggest a highly generalized challenge to Rhode Island's semi-closed primary system,[6] and although CMP's memorandum in support of its motion for summary judgment notes that the small size of the party makes it an easy target for raiders, there is certainly no coherent articulation of the "disparate impact" rationale as a basis for invalidating the statute. To the contrary, the pleadings below suggest that CMP's objection to the primary requirement was based on First Amendment associational rights (in particular, a party's right to decide for itself how its standard bearer will be chosen), not on equal protection concerns. CMP's general challenge was simply insufficient to raise the "disparate impact" challenge in the district court, and the fact that CMP's argument would have required factual development in the trial court makes application of the rule of forfeiture particularly appropriate here. There are no extraordinary circumstances in this case that would cause us to depart

---

**3.** R.I. Gen. Laws § 17–15–6 provides in pertinent part:

> **Conventions and caucuses replaced—Parties holding primaries—Forms.**
> The primary elections thus held shall replace the party conventions and caucuses for making the nominations herein provided for [subject to exceptions not relevant here].

R.I. Gen. Laws § 17–15–6. In accordance with R.I. Gen. Laws § 17–15–6, CMP has employed the primary election system to select its nominees, notwithstanding its own bylaw which calls for nominees to be selected by party caucus open only to party members.

**4.** Although we apparently are not asked to decide whether mandatory primaries are constitutional, we note Supreme Court dicta strongly suggesting that a state may dictate the method by which a party nominates a candidate. *See American Party of Tex. v. White,* 415 U.S. 767, 781, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) ("It is too plain for argument ... that the State ... may insist that

intraparty competition be settled before the general election by primary election or by party convention."); *see also Tashjian,* 479 U.S. at 237, 107 S.Ct. 544 (Scalia, J., dissenting) (the state is not "bound to honor a party's democratically expressed desire that its candidates henceforth be selected by convention rather than primary"). Moreover, the only federal appeals court to consider the question has upheld the constitutionality of mandatory primary elections. *See Lightfoot v. Eu,* 964 F.2d 865, 872–73 (9th Cir.1992).

**5.** "Raiding" is a practice "whereby voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the result of the other party's primary." *Rosario v. Rockefeller,* 410 U.S. 752, 760, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973).

**6.** By "semi-closed primary system," we mean a system in which participation in a party's primary is limited to those who have registered as members of that party and independents. *See California Democratic Party,* 169 F.3d at 650.

from the well-established appellate rule that arguments raised for the first time on appeal will not be considered. *See Campos–Orrego v. Rivera,* 175 F.3d 89, 95 (1st Cir.1999); *Tele-Communications, Inc. v. Comm'r of Internal Revenue,* 104 F.3d 1229, 1232–33 (10th Cir.1997). The district court's ruling on the mandatory primary requirement will stand.

## Rhode Island's Semi-Closed Primary System

 The State contends that the district court erred by concluding that R.I. Gen. Laws § 17–15–24, which prohibits voters registered in one party from voting in the primary of another party, is unconstitutional to the · extent that it prohibits such voters from voting in the primary of another party whose bylaws would permit their participation.[7] The district court, relying on Supreme Court authority it considered controlling, ruled that R.I. Gen. Laws § 17–15–24 unconstitutionally prevents CMP from inviting registered voters from other parties to vote in the CMP primary.[8] *See Cool Moose Party,* 6 F.Supp.2d at 120–22. On appeal, the State argues that the Supreme Court case on which the district court relied, *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986), is distinguishable and that the statute must be upheld in its entirety. While we agree that *Tashjian* is not on all fours with the case now before us, we nonetheless conclude that the State has failed to offer adequate justifications for R.I. Gen. Laws § 17–15–24's infringement upon the associational rights of CMP.[9]

7. R.I. Gen. Laws § 17–15–24 provides in pertinent part:

 **Disqualification by activity in other party.**
 No person shall be entitled to vote in the primary election of any political party who has voted in a primary election as a member of any other political party and has not changed his or her party designation as provided in chapter 9.1 of this title or has designated his or her affiliation with any other political party, as set forth in chapter 9.1 of this title. . . .

 R.I. Gen. Laws § 17–9.1–24 provides in pertinent part:
 **Change of Designation**
 Any person who has designated his or her party affiliation pursuant to § 17–9.1–23 may change the designation on or before the ninetieth (90th) day preceding the primary election for which the person is eligible. . . .

8. Although the State does not raise the question of CMP's standing to challenge R.I. Gen. Laws § 17–15–24, we pause to consider the matter briefly. *See In re Dein Host, Inc.,* 835 F.2d 402, 404 (1st Cir.1987) (federal courts must satisfy themselves as to a party's standing, whether or not such an issue has been raised by any of the litigants). As noted previously, *see supra* note 3, CMP's own bylaws call for selection of nominees by party caucus *open only to party members.* This bylaw's member-only provision arguably casts some doubt on whether CMP's grievance could be redressed by a favorable judicial ruling, since the bylaw itself prohibits participation by non-members in the nominee selection process. *See Penobscot Air Svcs., Ltd. v. FAA,* 164 F.3d 713, 727 (1st Cir.1999) (to pass test for Article III standing, (1) the plaintiff must have suffered, or be threatened with, an actual injury, (2) that is traceable to the defendant, and (3) *that is likely to be redressed by a favorable judicial decision* ) (emphasis added). However, notwithstanding the bylaw providing for a member-only caucus, CMP has used the primary election system to select its candidates, as required by law. *See* Stipulated Fact # 12 (stating that "in the September 10, 1996 primary election 14 people voted in the Cool Moose primary"). The bylaws do not expressly prohibit non-member participation in the primary, and CMP represents on appeal that it desires non-member participation. Accordingly, we conclude that CMP's grievance could be redressed by a judicial decision holding that primaries must be open to all otherwise eligible voters if the party so desires.

9. We recognize that CMP's positions with respect to R.I. Gen. Laws §§ 17–15–6 and 17–15–24 are facially inconsistent. On the one hand, CMP objects to § 17–15–6, Rhode Island's mandatory primary system, because it exposes the party to the risk of raiding. On the other hand, CMP objects to § 17–15–24, which prohibits affiliated voters from voting in the primary of another party, arguing that it should be able to determine for itself the boundaries of its own association. If raiding is the basis of CMP's concern with respect to § 17–15–6, then CMP's quest to limit the ap-

In *Tashjian*, 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514, the Republican Party of the State of Connecticut and several of its officials challenged a Connecticut statute requiring voters in a party primary to be registered members of that party, notwithstanding a Republican party rule permitting independent voters to participate. Using the balancing framework applicable to challenges to election laws, the Supreme Court first observed that the "freedom to join together in furtherance of common political beliefs 'necessarily presupposes the freedom to identify the people who constitute the association.'" *Id.* at 214, 107 S.Ct. 544 (quoting *Democratic Party of United States v. Wisconsin ex. rel. La-Follette*, 450 U.S. 107, 122, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981)). By hindering the party's attempts to broaden the base of public participation in and support for its activities, the statute burdened the party's association rights:

> The statute here places limits upon the group of registered voters whom the Party may invite to participate in the "basic function" of selecting the Party's candidates. The State thus limits the Party's associational opportunities at the crucial juncture at which the appeal to common principles may be translated

into concerted action, and hence political power in the community.

*Id.* at 215–16, 107 S.Ct. 544.

The Court turned next to an examination of the four interests that were asserted by the State to justify the statute's infringement on the party's associational rights, among which was the interest in "protecting the integrity of the two-party system and the responsibility of party government." *Id.* at 222, 107 S.Ct. 544. Although accepting the proposition that the State may have an interest in preserving the integrity of the electoral process, the Court unequivocally rejected the notion that a State has any interest in paternalistically protecting a political party from its own (arguably) poor decisions concerning the boundaries of its association.[10] Because the State "'may not constitutionally substitute its own judgment for that of the Party,'" *id.* at 224, 107 S.Ct. 544 (quoting *Democratic Party*, 450 U.S. at 123–24, 101 S.Ct. 1010), the Party was free to exercise its associational right to define its own boundaries by inviting independent voters to participate in its primary election, even if that decision was unwise, *see id.* at 225, 107 S.Ct. 544.

plicability of § 17–15–24 would appear to be illogical. Opening up the primary to affiliated voters would only exacerbate the risk of raiding. Nonetheless, there is a thread of philosophical consistency, if not pragmatic consistency, in CMP's positions: both reflect, at bottom, the idea that political parties should be free to decide for themselves the most desirable system for selecting party nominees and who should be eligible to vote for those nominees.

**10.** In making this point, the court distinguished the challenge brought by the political party in the case before it from challenges brought in other political association cases by voters or potential candidates where the challenged statutes were upheld:

> The statute in *Storer* [*v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)] [imposing a one-year disaffiliation requirement on candidates who wished to run as independents] was designed to protect the parties and the party system against the

> disorganizing effect of independent candidacies launched by unsuccessful putative party nominees. This protection, like that accorded to parties threatened by raiding in *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) [involving a challenge by voters to a New York statute requiring a voter to enroll in the party of her choice at least 30 days before the general election in order to vote in the next party primary] is undertaken to prevent the disruption of political parties from without, and not, as in this case, to prevent parties from taking internal steps affecting their own process for the selection of candidates. The forms of regulation upheld in *Storer* and *Rosario* imposed certain burdens upon the protected First and Fourteenth Amendment interests of some individuals, both voters and potential candidates, in order to protect the interests of others. In the present case, the state statute is defended on the ground that it protects the integrity of the Party against the Party itself.

> *Tashjian*, 479 U.S. at 224, 107 S.Ct. 544.

The *Tashjian* Court was careful to point out, however, that its ruling was limited to the factual situation before it—namely, a political party's desire to invite *independent* voters to participate in its primary:

> Our holding today does not establish that state regulation of primary voting qualifications may never withstand challenge by a political party or its membership. A party seeking, for example, to open its primary to all voters, *including members of other parties*, would raise a different combination of considerations. Under such circumstances, the effect of one party's broadening of participation would threaten *other parties* with the disorganization effects which the statutes in [*Storer*] and [*Rosario*] were designed to prevent.

*Id.* at 224 n. 13, 107 S.Ct. 544 (emphasis added). The instant case presents exactly the hypothetical situation contemplated by the *Tashjian* footnote: CMP wishes to invite Democrats, Republicans, and other *affiliated* voters to participate in its primary. *Tashjian* does not purport to control such a situation, and in fact suggests that a state may well be able to offer sufficiently weighty rationales in support of a statute prohibiting affiliated voters from participating in the primary of another party.

Accordingly, the State is correct that the *Tashjian* case does not necessarily render unconstitutional R.I. Gen. Laws § 17–15–24's prohibition on affiliated voters' participation in another party's primary despite the consent of a party to that participation. Indeed, *Tashjian* leaves the door open for the State to argue that R.I. Gen. Laws § 17–15–24 is necessary to prevent distortions of the electoral process that affect not only CMP, but also other parties or the party system generally. Curiously, however, the State failed to make such an argument in either the district court or on appeal.

In defending § 17–15–24 before the district court, the State apparently misunderstood the nature of CMP's challenge.[11] Based on its memorandum in support of its motion for summary judgment, it appears that the State thought CMP was only challenging the *length of time* a voter must be disaffiliated from her former party before she may vote in another party's primary—*i.e.*, ninety days. *See* R.I. Gen. Laws § 17–9.1–24 (quoted *supra* note 8).[12] The State missed CMP's actual, more fundamental claim that a state cannot prevent a party from inviting voters to participate in its primary, irrespective of whether or when the voters had disaffiliated from other parties. Given this misapprehension of the nature of CMP's challenge, the State's memorandum in support of its motion for summary judgment does not explain the interests that the State relies upon to justify § 17–15–24's infringement on CMP's

**11.** In fairness to the State, we note that the complaint filed by CMP in the district court was highly ambiguous, making it difficult for the State to understand CMP's objection to § 17–15–24.

**12.** For example, citing the decision of the Supreme Court in *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973), the State argued that "it is quite apparent that the ninety (90) day period imposed by the present R.I.G.L. § 17–15–24 is far less burdensome than the period designated in the New York statute which was the subject matter of the *Rosario* decision. Accordingly, Rhode Island's statute is constitutional." In making this argument, the State failed to note the distinction noted by the Supreme Court in *Tashjian*—that the challenge in *Rosario* was

brought by *voters* who claimed that the requirement of enrollment in the party of choice at least thirty days before the general election in order to vote in the next party primary abridged their freedom to associate with the political party of their choice. The Supreme Court disagreed in *Rosario*, ruling that the enrollment requirement was "merely a time limitation on when they had to act in order to participate in their chosen party's next primary" rather than a ban on their freedom of association. *Rosario* did not address the claim of a *party* that a law preventing voters registered in another party from voting in its primary, despite the desire of the party that they do so, unconstitutionally burdened the political association rights of the party. That is the claim made by CMP in this case.

associational right to define its own boundaries.

The State does not do much better in its brief on appeal. Although it argues that this case is not controlled by *Tashjian,* and cites in particular footnote 13 from that opinion, *see Tashjian,* 479 U.S. at 224, n. 13, 107 S.Ct. 544 (reserving the question of whether a party seeking to open its primary to *affiliated* voters would prevail), the State again fails to articulate with any clarity the state interests that are served by § 17–15–24's prohibition on a political party's ability to invite affiliated voters to participate in its primary. In a few sentences at the end of its brief, the State does contend that R.I. Gen. Laws § 17–15–24 is necessary to confine voters to "a single nominating act"—*i.e.,* to ensure that voters do not vote in the primaries of more than one party.

At oral argument, the State tried unsuccessfully to articulate the interests advanced by § 17–15–24. First, the State acknowledged that Rhode Island law makes it a crime to engage in more than one nominating act, thus rendering the State's "single nominating act" rationale wholly unconvincing. Next, the State argued that § 17–15–24's prohibition on a political party's ability to invite affiliated voters to participate in its primary was justified by a concern for "raiding." We asked for clarification, prompting this exchange with the bench:

**Q:** What does party raiding mean in this context? ...

...

**A:** The concern ... is that members of one political party seeking to disrupt the internal workings of the other political party and to go in and affect the choice of the nominee of the party only for the purposes of choosing let's say the weaker candidate will ... really dissolve or weaken the votes of the actual members of the candidates [sic].

**Q:** But [CMP is] saying don't be so paternalistic. Let us ... decide who will come in to vote and who we don't want to come in to vote. That's our associational decision to make.

**A:** Right. And the Supreme Court has said that the states do have the ability to protect the party from the internal workings of the party itself. That was reiterated in *Tashjian* and the most recent *Timmons* case.

**Q:** I thought *Tashjian* was very much to the contrary on that issue.

**A:** The basic right was reiterated. But *Timmons* specifically addressed that and in fact stated the state has a compelling interest in maintaining the distinct identities of the party and in protecting the party from the party itself.

Through this pointed exchange, it became clear that the State's ambiguous raiding rationale is entirely paternalistic—*i.e.,* the State justifies § 17–15–24 by saying that the statute prevents a foolhardy party from making unwise decisions concerning the boundaries of its association that might expose it to raiders.

Contrary to the State's contentions at oral argument, however, the Supreme Court has been clear in its rejection of paternalistic justifications for infringements on a political party's constitutional right to define the boundaries of its association. *See Tashjian,* 479 U.S. at 224, 107 S.Ct. 544 (infringement on political party's associational rights cannot be defended on ground that "it protects the integrity of the Party from the Party itself"); *see also Eu,* 489 U.S. at 227–28, 109 S.Ct. 1013 ("[E]ven if a ban on endorsements saves a political party from pursuing self-destructive acts, that would not justify a State substituting its judgment for that of the party."); *Timmons,* 117 S.Ct. at 1374 (state's strong interest in the stability of its political systems is not "a paternalistic license for States to protect political parties from the consequences of their own internal disagreements").[13] Indeed, when

---

13. To the extent that the State contends *Tim-* *mons* authorized a state to enact laws that are

raiding has been recognized as a valid justification for a state election law, it has been in the context of *voter* challenges to election laws that inhibit registered voters' ability to invade another party's primary *without that party's consent. See, e.g., Kusper v. Pontikes,* 414 U.S. at 59–60, 94 S.Ct. 303; *Rosario,* 410 U.S. at 760, 93 S.Ct. 1245. In this case, although CMP *wishes* to invite voters affiliated with other parties to participate in its primary election, the State forbids the invitation without offering a plausible and constitutionally permissible explanation for the prohibition.[14]

Although we do not require "elaborate, empirical verification of the weightiness of the State's asserted justifications" for such a prohibition, *Timmons,* 117 S.Ct. at 1372 (citing *Munro v. Socialist Workers Party,* 479 U.S. 189, 195–96, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986)), the State must at least articulate plausible and constitutionally legitimate justifications. We will not invoke justifications out of whole cloth on the State's behalf. *See Timmons,* 117 S.Ct. at 1379 (Stevens, J., dissenting) (noting that "[o]ur opinions have been explicit

in their willingness to consider only the particular interests put forward by a State to support laws that impose any sort of burden on First Amendment rights") (citing *Anderson v. Celebrezze,* 460 U.S. 780, 817, 103 S.Ct. 1564, 75 L.Ed.2d 547; *Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245). Given the State's failure to articulate any legitimate interest for the restriction of § 17–15–24 on the ability of a party to invite registered voters from other parties to participate in its primary, we must affirm the district court's ruling.[15]

*Affirmed.*

---

14. The State's brief points out in passing that an affiliated voter *can* vote in another party's primary, *provided* that she disaffiliates from her party at least 90 days before the primary election. *See* R.I. Gen. Laws § 17–9.1–24. This argument was expressly rejected by the *Tashjian* Court. *See Tashjian,* 479 U.S. at 216 n. 7, 107 S.Ct. 544 (noting, *inter alia,* that "the formal affiliation process is one which individual voters may employ in order to associate with the Party, but it provides no means by which members of the Party may choose to broaden opportunities for joining the association by their own act, without any intervening act by potential voters").

15. Of course, our ruling does not preclude the Rhode Island legislature from revisiting the matter should it reach the conclusion that some interest other than those advanced by the State in this litigation provides constitutional justification for burdening a party's right to invite registered voters from other parties to participate in its primary.

designed solely to prevent a party from making self-destructive decisions, it misreads that case. *Timmons* involved a challenge brought by a minor political party to Minnesota's anti-fusion laws (prohibiting candidates from appearing on the general ballot as the candidate of more than one party). *See Timmons,* 117 S.Ct. at 1367–69. In upholding the statute, the Court did recognize, *inter alia,* that "States have a strong interest in the stability of their political systems," and that this interest permits them "to enact reasonable election regulations that may, in practice, favor the traditional two-party system." *Id.* at 1374. The *Timmons* Court did not authorize solely paternalistic intervention by the state in a party's decision-making; to the contrary, citing *Eu* and *Tashjian,* the Court pointed out that a state's interest in the stability of its political system is not "a paternalistic license for States to protect political parties from the consequences of their own internal disagreements." *Id.* at 1374.