# United States Court of Appeals
## For the First Circuit

No. 04-1803

RICHARD P. McCLURE and MARTHA McCLURE,

Plaintiffs, Appellants,

v.

WILLIAM F. GALVIN, Secretary of the Commonwealth;
ELIZABETH L. DELANEY, Town Clerk, Town of Chelmsford;
JANE DOE, Chelmsford Election Poll Clerk,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
Lipez, Circuit Judge.

Richard P. McClure pro se.
James J. Arguin, Assistant Attorney General, with whom
Thomas F. Reilly, Attorney General, was on brief, for appellee
William F. Galvin.
Brian W. Riley, Lauren F. Goldberg, and Kopelman and
Paige, P.C. on brief for appellee Elizabeth L. Delaney.

October 8, 2004

**LYNCH**, **Circuit Judge**.  Richard McClure filed suit against the Secretary of the Commonwealth of Massachusetts and others, alleging an interference with both his right to vote and his right to run for political office under the First and Fourteenth Amendments of the United States Constitution.  He sought injunctive and declaratory relief, requiring that he be placed on the ballot as an independent candidate in the race for a state senate seat.[1]

In March of 2004, McClure had sought certification from a town clerk to be placed on the ballot as an unenrolled candidate for state senate in Massachusetts.  "Unenrolled" means not affiliated with any political party.  The town clerk refused to issue the certification because McClure had voted in the Democratic party presidential primary on March 2, 2004.  Pursuant to a state statute, Mass. Gen. Laws ch. 53, § 37, such voting automatically enrolled McClure as a Democrat.  Pursuant to another state statute, ch. 53, § 6, one running for an in-state office as an independent must not be enrolled in a political party for the ninety days preceding the filing deadline for primaries for candidates running for state senate.  As a result, McClure's temporary enrollment automatically disqualified him from running for the state senate as

---

[1]McClure's wife, Martha McClure, was also named as a plaintiff in the suit and submitted an affidavit.  She alleges that she was, by virtue of her husband's exclusion, prohibited from voting for the candidate whose political beliefs are most in line with her own, and she claimed to be suing on behalf of all other voters similarly situated.  We do not discuss her claims further as they make no difference in the disposition of the case.

an independent because the deadline for filing an intent to run for that office was less than ninety days after the date of the Democratic primary in which he voted.

The district court, after an expedited hearing, denied McClure's motion for a preliminary injunction and dismissed his claim on May 17, 2004. McClure v. Galvin, No. Civ.A. 04-CV-10826-RGS, 2004 WL 1092325, at *4 (D. Mass. May 17, 2004). We now affirm this judgment.

**I.**

The statutory scheme at issue here requires some elaboration.

Massachusetts General Laws chapter 53, section 6 provides that an unenrolled candidate for elected office will not have her name printed on the ballot unless a certificate confirming this unenrolled status is obtained from the registrar of voters of the town where the would-be candidate is a registered voter. Such a certification will not be granted "to any such candidate who shall have been an enrolled member of any political party during the time prior to the last day for filing nomination papers as provided in section ten, and on or after the day by which a primary candidate is required by section forty-eight to establish enrollment in a political party." Mass. Gen. Laws ch. 53, § 6. In turn, chapter 53, section 48 states that an enrolled candidate seeking to enter a party primary must have been a member of that party for the

ninety days before the filing deadline for that primary, which is the "last Tuesday in May" for candidates for state senate. The beginning date of the nonenrollment period for independent candidates is thus ninety days prior to the last Tuesday in May. Next, chapter 53, section 10 establishes the "last Tuesday in May" as the deadline for filing candidacies for in-state offices for the general elections, and the last Tuesday in May thus acts as the ending date for the nonenrollment period. The effect of chapter 53, section 6 in 2004 was to require unenrolled candidates seeking a place on the ballot for state senate not to have been enrolled as a member of any political party between February 24, 2004, and May 25, 2004. This year, the state presidential primary was held within the ninety-day period.

The nonenrollment period for independent candidates for state-wide (e.g., governor) and federal (e.g., United States Senator) offices begins one week later, ninety days prior to the first Tuesday in June. Mass. Gen. Laws ch. 53, § 48. The ninety-day period thus did not include the presidential primaries for individuals running for these offices.

A similar scheme is in place for <u>enrolled</u> candidates. <u>See</u> Mass. Gen. Laws ch. 53, § 48 (individual seeking ballot placement for elected office as a member of any party, and who thus seeks to run in a party primary, needs a certificate "certifying that he has been enrolled as a member of the political party whose

-4-

nomination he seeks throughout the ninety days prior to the last day herein provided for filing nomination papers [for the primary] with the state secretary. . . ."). In fact, since section 6 incorporates section 48 by reference, the beginning date of the period within which candidates running for a given office under a party banner must have been a member of that party is the exact same date as the beginning date of the period within which unenrolled candidates must not have been enrolled as a member of any party. For state senate candidates, this key date is ninety days prior to the last Tuesday in May. See Mass. Gen. Laws ch. 53, § 48.

Massachusetts General Laws chapter 53, section 37 as currently in effect states that voters who are unenrolled at the time of appearing to vote in a primary may generally vote in any party's primary. Upon appearing to vote in a primary, a ballot clerk asks unenrolled voters in which primary they "desire[] to vote"; they may then vote in that primary. Mass. Gen. Laws ch. 53, § 37. Generally, an unenrolled voter can vote in party primaries without losing her unenrolled status.

There is an exception, however, for presidential primaries; in a presidential primary, upon voting, "the voter shall become enrolled in and shall remain a member of the political party whose ballot he received until he files a certificate, signed under the pains and penalties of perjury, with the board of registrars of

voters, requesting to have his enrollment changed to another party or political designation or cancelled . . . ." Mass. Gen. Laws ch. 53, § 37. The change of status back to unenrolled is effective once the board receives the certificate. See Mass. Gen. Laws ch. 53, § 38. There is no set amount of time that one must remain a member of the party in whose primary one has just voted; unenrollment can take place immediately.

Before a 1994 amendment to chapter 53, section 37, all primary voting by unenrolled voters (not simply such voting in presidential primaries) automatically enrolled previously unenrolled voters in that party. See Mass. Gen. Laws Ann. ch. 53, § 37, Historical and Statutory Notes. Since the 1994 amendment, however, only the presidential primaries have had that effect; an unenrolled voter may vote in all other primaries without losing her unenrolled status.[2]

Voters currently enrolled in one party in Massachusetts may not generally vote in any other party's primary, and they may not switch their enrollment to another party within twenty days of a primary. Mass. Gen. Laws ch. 53, § 38. One effect of these laws is that no voter in Massachusetts, enrolled or unenrolled, may vote

---

[2]A recent amendment to section 37 will take effect on October 13, 2004, fully opening up even the presidential primaries to unenrolled voters. Unenrolled voters will no longer have to enroll in a party, even temporarily, in order to vote in a presidential primary. Thus, the problem presented in this case should not recur.

in more than one party's primary on a given primary day.  See Mass. Gen. Laws ch. 53, §§ 37, 38.

McClure is a registered voter in Chelmsford, Massachusetts, and was a registered Republican until February 10, 2004; on that date he disenrolled and changed his status to unenrolled.  On March 2, 2004, McClure went to the polls to vote in the Democratic party's presidential primary in Massachusetts.  In his affidavit, he states that on that date, the ballot clerk asked him in which party's presidential primary he would like to vote and when he asked for a Democratic party ballot, the clerk put a large "D" next to his name.  McClure then told the ballot clerk that he did not want to enroll in the Democratic party; the clerk told him that he would not be enrolled in the Democratic party and handed him a "certificate" indicating that he was "establishing [his] voter status as 'unenrolled.'"  After voting, a different clerk (an "exit clerk") took this certificate from McClure.  Elizabeth Delaney, the town clerk of the Town of Chelmsford, stated, in her affidavit, that the effect of this certificate was merely to immediately change McClure's enrollment status back to "unenrolled."  However, he was briefly enrolled as a Democrat.

On March 25, 2004, McClure, having satisfied the other requirements to be an unenrolled candidate for state senate whose name appears on the ballot, applied to the Chelmsford town clerk for a voter registration certificate.  The town clerk had called

him the previous day (March 24) and told him over the phone that she would not be able to grant such a certificate because McClure voted in the Democratic presidential primary on March 2, 2004, which enrolled him as a Democrat within ninety days of the May 25 deadline for filing. In this conversation, McClure informed her of the misinformation he received from the ballot clerk. The town clerk responded that the election laws are very complex, one cannot expect a checker at the polls to understand all of their details, and McClure should have called her as chief election official if he had any questions or doubts. On March 26, 2004, the town clerk formally and in writing denied McClure's certificate.

## II.

McClure filed suit in federal district court in Massachusetts on April 26, 2004, alleging that the ninety-day enrollment restriction effectuated by Massachusetts General Laws chapter 53, sections 6 and 37 violated his First Amendment speech and association rights as a voter and as a candidate for public office. He also asserted that it violated his Equal Protection Clause rights because it constituted invidious discrimination against unenrolled voters. He finally alleged both that the statutory scheme itself gave unconstitutionally inadequate notice to McClure and that the negligence of various town and state officials led to a similar lack of notice. McClure sought declaratory relief, injunctive relief, and attorney's fees.

Given the time constraints involved, the district court granted McClure's motion for an expedited hearing on his motion for a preliminary injunction, and then denied the preliminary injunction and dismissed the claim under Fed. R. Civ. P. 12(b)(6). McClure, 2004 WL 1092325, at *1, *4. The district court, relying on the Supreme Court's decision in Storer v. Brown, 415 U.S. 724 (1974), held that McClure could not state a claim on the merits. McClure, 2004 WL 1092325, at *2-*3. Storer upheld a California law preventing candidates from having their names placed on the ballot in a general election as independents if they had registered with a political party at any time within one year prior to the date of the primary election that preceded that general election. Storer, 415 U.S. at 728. The district court held that the scheme at issue in Storer was identical in its relevant respects to the one at issue here, thus foreclosing the bulk of McClure's claim. McClure, 2004 WL 1092325, at *2-*3.

The district court also held that McClure's attempt to distinguish Storer failed; the fact that the scheme at issue here only applied to presidential primaries and not to all primaries is a "distinction . . . without a meaningful difference" because "[i]t is impossible to see how a statute that places an even lesser burden on an independent voter who desires to seek public office could be more violative of a voter's rights." Id. at *3. As for the rest of McClure's claims (arguing lack of fair notice), the

-9-

court cited the principle that citizens are presumed to know the law and added that the ballot clerk's negligence provided no basis for a viable estoppel claim. Id.

McClure appealed the denial of the preliminary injunction and the dismissal of the claim to this court. McClure has not, however, raised on appeal his claims of lack of fair notice or misrepresentation by the ballot clerk; those claims are waived. The only claim before this court is that the statutory scheme unduly burdens McClure's rights to vote and to run for office.

## III.

Appellate review of a trial court's denial of a preliminary injunction is deferential: we will reverse such a denial only if the district court "mistook the law, clearly erred in its factual assessments, or otherwise abused its discretion in granting" the preliminary injunction. McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001). Of course, a material error of law constitutes an abuse of discretion. Review of the dismissal of a claim under rule 12(b)(6) for failure to state a claim upon which relief can be granted is de novo. Martin v. Applied Cellular Tech., Inc., 284 F.3d 1, 5 (1st Cir. 2002). In the end, both the dismissal of the claim and the denial of the preliminary injunction turn on pure issues of law.

The standard of review for a law that burdens ballot access and voting rights is not static; rather, the Supreme Court has suggested something of a sliding scale approach and has noted that there is no "bright line" to separate unconstitutional state election laws from constitutional ones. Timmons v. Twin Cities Area New Party, 520 U.S. 351, 359 (1997). We must "weigh the 'character and magnitude' of the burden the [s]tate's rule imposes [on rights to vote and run for office] against the interests the state contends justifies that burden, and consider the extent to which the [s]tate's concerns make the burden necessary. . . . Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a [s]tate's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" Id. at 358 (quoting Burdick v. Takushi, 504 U.S. 428, 434 (1992)) (citations omitted).

McClure is correct that the state's interests here are weaker than the interests stated in Storer. The burden imposed on McClure's rights here is also not severe. In the end, the state's important regulatory interests, while more fragmented than those in Storer, are sufficient to justify that burden.

McClure argues that the scheme forces him to make a difficult choice between two crucial rights, voting and running for office, because the scheme does not allow him, within a ninety-day

-11-

period, both to run for state senate as an independent and to vote in a party's presidential primary. But voting in a presidential primary has never been treated in the same way as voting in a general election, and indeed, voting in the primary of a party to which one does not belong is not a constitutional right. See Cal. Democratic Party v. Jones, 530 U.S. 567, 573 n.5 (2000) ("As for the associational 'interest' in selecting the candidate of a group to which one does not belong, that falls far short of a constitutional right, if indeed it can even fairly be characterized as an interest. It has been described in our cases as a 'desire' . . . ."). It is instead an associational right of a political party to decide whether it wants to include nonmembers in its own primaries; this is a decision that the state generally must respect in its regulation of primaries. See id. at 575; Tashjian v. Republican Party of Conn., 479 U.S. 208, 214-16 (1986); Cool Moose Party v. Rhode Island, 183 F.3d 80, 85 (1st Cir. 1999).

The Massachusetts scheme, of course, does not operate to exclude existing Democrats from voting in the presidential primary and then running for office as Democrats; it only prevents those who are unenrolled or enrolled in a different party from both voting in the Democratic presidential primary and then running for office under their old party designation. The choice that McClure points to is only a choice between running for political office (which is surely an important political right) and voting in

another organization's primary (which is not a constitutional right at all). The state places no great burden on McClure when it asks him to refrain from the latter in order to participate in the former.

The remaining burden imposed on McClure by this statute is that it forces him to think ninety days ahead before the filing deadline if he plans on becoming an unenrolled candidate, because he needs to be careful that he does not vote in a disqualifying primary within this time period. But Storer held that a potential candidate was not significantly burdened by a statute that forced him to think ahead one full year before becoming an independent candidate. 415 U.S. at 734, 736.

The significance of the burden on McClure is further reduced by the fact that it falls evenly on all political groups. The Supreme Court has said that review of election regulations will be far sharper if there is discrimination against certain distinct political groups. See, e.g., Anderson v. Celebrezze, 460 U.S. 780, 793-94 (1983). McClure argues that the Massachusetts scheme discriminates against unenrolled voters, but this is not so. The scheme applies evenhandedly to enrolled individuals of all parties as well as to unenrolled individuals. All candidates are banned from running for office using one enrollment status if they have held some other enrollment status for the ninety days before the primary filing deadlines. The rule thus equally burdens

-13-

Republicans, Democrats, and independents. If anything, the laws give unenrolled voters more rights than other voters by permitting them to vote in any party's primary (at least if they are willing to change designations); individuals enrolled in a party cannot vote in a different party's primary unless they changed their enrollment more than twenty days before the primary. Mass. Gen. Laws ch. 53, § 38.

McClure also argues that the election laws discriminate against individuals running for in-state as opposed to state-wide and federal offices, because the filing deadline for in-state offices is one week earlier than the filing deadlines for other offices. Thus the presidential primaries occurred within the ninety-day period for in-state offices but not for state-wide or federal offices. It is not rational to infer from this fact an intent on the part of a state to discriminate against potential in-state officials as a group while favoring potential state-wide and federal officials. No evident reason for an inference of such discrimination exists. At any rate, the defendants give entirely legitimate reasons for the different deadlines. Candidates for state-wide and federal offices generally have higher signature requirements to get on the ballot than candidates for in-state offices. See Mass. Gen. Laws ch. 53, § 6. Also, administratively, it makes more sense for election officials to have two different

-14-

deadlines as opposed to one, to avoid an excessive workload. We see no invidious discrimination here.

Having found that the laws place little burden on McClure, we weigh that burden against the state's regulatory interests in utilizing its scheme. The defendants point to the state interests articulated in Storer, which were considered "compelling" in the context of that case. See Storer, 415 U.S. at 736. Those interests included preventing "splintered parties" and "unrestrained factionalism" and protecting "the stability of [the state's] political system." Id. As Storer explained, the statute "protects the direct primary process by refusing to recognize independent candidates who do not make early plans to leave a party and take the alternative course to the ballot. It works against independent candidacies prompted by short-range political goals, pique, or personal quarrel. It is also a substantial barrier to a party fielding an 'independent' candidate to capture and bleed off votes in the general election that might well go to another party." Id. at 735.

McClure's chief argument is that Storer must be distinguished because of the state's peculiar scheme as to primaries. McClure admits that the Massachusetts provision barring candidates from running as independents if they have been enrolled as members of other parties within ninety days of the filing deadline, Mass. Gen. Laws ch. 53, § 6, is very similar to (and in

-15-

fact much less stringent than) the provision at issue in <u>Storer</u>. However, he challenges the <u>way</u> he became enrolled, by voting in the Massachusetts presidential primary, pursuant to Massachusetts General Laws chapter 53, section 37. He argues that people like him, who were enrolled in a party only through voting in a presidential primary and who were enrolled for a very short period of time, cannot constitutionally be disqualified from being placed on the ballot as independents because the state has no important interest in disqualifying such people.

McClure asserts that many of the interests at play in <u>Storer</u> do not apply to his case because the enrollment requirements here only apply to presidential primaries, and McClure is seeking to run in a state race. Thus, the concern in <u>Storer</u> about sore loser candidates who run as independents in order to bring intra-party disputes outside of the party is not present in his case. McClure also argues that the fact that Massachusetts only forces unenrolled voters who vote in presidential primaries, and not other sorts of primaries, to affiliate with a party, and that even when such affiliation is forced, it need only be very brief because a voter (like McClure) can immediately unenroll, shows that the state interest in closing primaries to non-affiliates is weak. McClure notes that the Massachusetts Supreme Judicial Court has stated that the Massachusetts primary scheme "blur[s] any meaningful distinction between open and closed primaries." <u>Metros</u> v. <u>Sec'y of</u>

-16-

the Commonwealth, 484 N.E.2d 1015, 1021 n.9 (Mass. 1985)(quoting Langone v. Sec'y of the Commonwealth, 446 N.E.2d 43, 47 (Mass. 1983)) (internal quotation marks omitted).

This case is not precisely on all fours with Storer: the state interests at play in the Massachusetts scheme are far weaker than the state interests at play in the California scheme at issue in Storer. Concerns about sore losers and short-term candidacies motivated by intra-party quarrel are not particularly well served by this scheme. Still, the scheme does help serve some other important state interests. It provides some assurance that unenrolled candidates actually are independent of party affiliations. Also, like the law upheld in Storer, it forces potential candidates for office to think ahead before the filing deadline, thus weeding out frivolous candidacies and only permitting serious candidates to go forward.

It is true that these state interests would be served more strongly by a scheme which made all primaries truly closed (thus forcing all primary voters to have prior enrollment in the party) and which disallowed all voters in such truly closed primaries from running for office under another party's banner or as an unenrolled candidate. The state's 1994 switch from a scheme that required party affiliation from unenrolled voters for voting in all primaries to a scheme that required affiliation only for voting in presidential primaries reflected a move towards the

opening up of the primary system to independent voters.  The purpose seems to have been to increase voter participation as a whole in those electoral contests.  See 1993 Mass. Acts ch. 475 (one key purpose of the emergency bill in which the 1994 amendments were embedded was to "increase electoral participation in the commonwealth").

But the state had an important reason for retaining the enrollment requirement for presidential primaries: it was trying to serve the will of the parties themselves.  The Democratic Party of the United States has a charter provision stating that delegates to the party's national convention must be chosen through processes which "restrict participation to Democrats only."  The Charter & The Bylaws of the Democratic Party of the United States, art. 2, § 4(e).  No party has challenged the enrollment requirement for presidential party primaries since the 1994 amendment.  States generally must respect the wishes of parties about who should be included in their own primaries, see Jones, 530 U.S. at 575; Tashjian, 479 U.S. at 214-16; Cool Moose Party, 183 F.3d at 85, so clearly acceding to these wishes constitutes an important state interest.

As well, the state could easily conclude that presidential primaries were different from other types of primaries; these types of primaries could justifiably be thought of as much more susceptible to inundation from non-affiliated voters

than other primaries because their turnout tends to be so much higher and the interest that they inspire so much broader. Further, there is less need to open these presidential primaries in order to encourage voter participation.

The state (again reflecting the interests of the two political parties) can thus have a strong interest in trying to curb the impact of non-affiliated voters on a party presidential primary. See Jones, 530 U.S. at 581-82 (law forcing parties to open primaries to all voters was unconstitutional because it "adulterat[ed]" their candidate selection process); Rosario v. Rockefeller, 410 U.S. 752, 760-62 (1973) (upholding statute designed to prevent inter-party raiding in primaries). Forcing presidential primary voters to enroll in the party ameliorated this potential problem. Disqualification from getting on the ballot as an independent is only a small piece of the disincentive scheme that is operating. For example, while McClure immediately disaffiliated from the Democratic party, many voters do not; the enrollment thus has the effect of making it more difficult for voters to vote in any primary involving another party during the next election cycle. Thus, even if the state chose, as it did in 1994, to open up other primaries, its interest in moving incrementally and not opening presidential primaries is a strong one. It is sufficient to survive the level of scrutiny we apply under Timmons.

McClure's final argument is that there were various alternative ways in which the state could have tailored its scheme to achieve the same ends with less of an infringement on his interests. For example, the state could have pushed back the filing deadline for in-state offices roughly a week, thus moving the presidential primaries out of the ninety-day window. But our review here is far from strict scrutiny and we will not speculate as to all of the other conceivable ways in which the state could have set up its framework. It is enough that the existing framework serves the significant state interests noted above.

We hold that the state interests in this statutory framework outweigh the infringement on McClure's rights. Because we resolve the case on these grounds, we need not reach the state's argument that McClure's delay in prosecuting this appeal renders it impracticable to fashion appropriate, non-disruptive relief.

**IV.**

The district court's denial of a preliminary injunction and dismissal of the claim are **affirmed**.