EBEL, Circuit Judge.
*1224 These appeals are only the most recent volley in the spate of litigation that has dogged the Utah Elections Amendments Act of 2014, commonly known as SB54, since it was signed into law in March 2014. At issue here, SB54 reorganized the process for qualifying for a primary ballot in Utah, most importantly by providing an alternative signature-gathering path to the primary election ballot for candidates who are unable or unwilling to gain approval from the central party nominating conventions. Prior to the passage of SB54, the Utah Republican Party ("URP") selected its candidates for primary elections exclusively through its state nominating convention, and it would prefer to continue to do so.
In this litigation, the URP sued Utah Lieutenant Governor Spencer Cox in his official capacity ("the State")[1] , alleging that two aspects of SB54 violate the URP's freedom of association under the First Amendment, as applied to the States by the Fourteenth Amendment. The two challenged sections (1) require parties to allow candidates to qualify for the primary ballot through either the nominating convention or by gathering signatures, or both (the "Either or Both Provision"); and (2) require candidates pursuing the primary ballot in State House and State Senate elections through a signature gathering method to collect a set number of signatures (the "Signature Requirement"). In two separate orders, the United States District Court for the District of Utah balanced the URP's First Amendment right of association against the State's interest in managing and regulating elections, and rejected the URP's claims. Re-conducting that balancing de novo on appeal, we AFFIRM.
I. BACKGROUND
According to its constitution and bylaws, the URP's process for nominating a candidate to the general election proceeds along a singular path. Candidates present their candidacy to the delegates at the party convention, and the delegates then caucus for nominees for each office. If a single candidate achieves over 60% of the caucus vote, that candidate is certified to the state for placement on the general election ballot, and no primary is held. If no candidate receives 60% of the convention vote, the top two candidates proceed to a state-administered primary election involving only URP members. The winner of that primary election is then certified to the state for placement on the general election ballot.
In 2014, the Utah Legislature-comprised of overwhelming Republican majorities in both the State House and State Senate-passed SB54, which addressed this process. Specifically, SB54 created two types of political parties: Registered Political Parties ("RPPs") and Qualified Political Parties ("QPPs"). Both RPPs and QPPs are eligible to have the name of the party printed next to their candidates on the general election ballot, Utah Code § 20A-6-301(1)(d) ; the only significant difference being how each is permitted to qualify candidates for its primary election. Members *1225 of RPPs who wish to participate in a primary election may do so only by gathering the signatures of 2% of the eligible primary voters for the office sought. Utah Code § 20A-9-403(3)(a).
If a party chooses to register as a QPP, however, it may still hold a caucus, and may certify the winners of the caucus to the primary ballot as before. See generally Utah Code § 20A-9-406 et seq . But unlike under the previous system, a party may not restrict access to the primary ballot just to candidates who emerge from the party convention. Under SB54, a candidate who is unwilling or unable to gain placement on the primary ballot through the caucus and convention may still qualify for the primary by gathering a set number of signatures by petition from eligible primary voters.[2] Specifically, SB54 provides that in order to qualify as a QPP the party must allow its members "to seek the registered political party's nomination for any elective office by the member choosing to seek the nomination by either or both of the following methods: (i) seeking the nomination through the registered political party's convention process ... or (ii) seeking the nomination by collecting signatures[.]" Utah Code § 20A-9-101(12)(c) ("the Either or Both Provision") (emphasis added).
It is clear from our review of the record that this "two-path" system was a compromise crafted between Utah legislators hoping to preserve the URP's caucus system and outside interests pushing a pure primary system. The end result was that a QPP's primary ballot can now include both candidates who qualified through the caucus and candidates who qualified by gathering signatures. Utah Code § 20A-9-408. As originally passed, it also required parties to allow unaffiliated voters to participate in their primary elections (the "Unaffiliated Voter Provision"), but that provision was later invalidated and is not before us.
II. PROCEDURE AND JURISDICTION
A. The First Lawsuit
SB54 was signed into law on March 10, 2014, and the URP filed suit later that year seeking an injunction and declaratory judgment that the law was unconstitutional as applied to the URP (the "First Lawsuit"). The Constitutional Party of Utah ("CPU") joined the First Lawsuit, challenging the Signature Requirement in particular.
In the First Lawsuit, the district court denied the URP and the CPU a preliminary injunction, ruling that none of the alleged constitutional burdens were severe save for the Unaffiliated Voter Provision, which was not yet ripe for review. Utah Republican Party v. Herbert, 133 F.Supp.3d 1337 (D. Utah 2015) ("URP I" ). Once the URP notified the state that it intended to become a QPP, that issue ripened and the district court granted the URP summary judgment invalidating the Unaffiliated Voter Provision. Utah Republican Party v. Herbert, 144 F.Supp.3d 1263, 1278-82 (D. Utah 2015) (" URP II" ).
In doing so, the court held that the Unaffiliated Voter Provision imposed a severe burden on the URP's associational rights and the State had no compelling interest to justify that burden. Id. The *1226 practical effect of the First Lawsuit, then, was to invalidate SB54's Unaffiliated Voter Provision, see id., while upholding the Signature Requirement, the Either or Both Provision, and all other aspects of SB54, see id.; URP I, 133 F.Supp.3d 1337. The rulings in the First Lawsuit are not before us on appeal.[3]
B. The Second Lawsuit
After the First Lawsuit, the URP announced that it would permit nomination only by caucus. The URP's justification for doing so was that it interpreted the Either or Both Provision as offering the political party (rather than the candidates) the option to allow nomination by either the signature gathering method, or the convention method, or both. The Lieutenant Governor responded that it was the State's position that under SB54 it is the party member's choice, not the party's, whether to pursue the nomination using the signature gathering method, the convention method, or both.
Following this interpretation by the Lieutenant Governor, the URP filed this suit in the United States District Court for the District of Utah seeking declaratory and injunctive relief that SB54 was unconstitutional. The phrasing of its Complaint was similar to the Complaint filed in the First Lawsuit. See Utah Republican Party v. Cox, 177 F.Supp.3d 1343, 1354 (D. Utah 2016) (" URP III" ) (noting similarities). The party reiterated its argument that SB54 violated its freedom of association under the First and Fourteenth Amendments, and added a claim that the State should be judicially estopped from advancing an interpretation of the Either or Both Provision that differed from the one it advanced in the First Lawsuit. Shortly thereafter the Utah Democratic Party ("UDP") intervened as co-plaintiff to defend against the possibility that portions of SB54 would apply to one political party but not the other, and to complain that the URP's bylaws and constitution violated SB54.
In February of 2016, the district court certified two questions of state law to the Utah Supreme Court. The first requested that court's interpretation of the Either or Both Provision, asking whether that provision meant the candidate member or the party had the right to choose which-or both-of the qualification processes to use. See Utah Republican Party v. Cox, 178 F.Supp.3d 1150, 1165 (D. Utah 2016) (" URP IV" ) (discussing certification). The Utah Supreme Court replied that the Either or Both Provision allows the candidate member, not the party, to select which of those two paths to follow in an effort to be certified to the primary ballot. Utah Republican Party v. Cox, 373 P.3d 1286, 1287 (Utah 2016). The second question, certified at the request of the UDP, was what would happen if a party elects to become a QPP under Utah law, but fails to comply with the requirements of that status. URP IV, 178 F.Supp.3d at 1166. The Utah Supreme Court declined to answer the second question, finding it not ripe for review because it was not yet clear whether the URP was going to comply with SB54. Cox, 373 P.3d at 1288.
While waiting for those answers from the Utah Supreme Court, the UDP and the State filed motions in federal court for judgment on the pleadings, and the URP filed for partial summary judgment on its claims relating to the Signature Requirement. On April 6, 2016, the district court ruled that (1) the URP's claims were not barred by claim preclusion, issue preclusion, *1227 or claim splitting, (2) the State should not be judicially estopped from advancing its interpretation of the Either or Both Provision, and (3) the Signature Requirement was valid because it did not present a severe burden to the URP. URP III, 177 F.Supp.3d at 1356, 1362, 1365. The district court granted summary judgment for the State on the judicial estoppel issue and also as to the signature requirements pursuant to Federal Rule of Civil Procedure 56(f). Id.
After the Utah Supreme Court answered the certified questions, the district court ruled on the remaining issues relating to the Either or Both Provision. It first held that the URP was not precluded from challenging the constitutionality of the Either or Both Provision, URP IV, 178 F.Supp.3d at 1170, and that the Either or Both Provision-as interpreted by the Utah Supreme Court-did not infringe on the URP's First Amendment right of association, id. at 1179. Finally, the court rejected the URP's claim that SB54 was the result of impermissible viewpoint discrimination, and then the court granted summary judgment for the State. Id. at 1187.
URP timely appealed the district court's grant of summary judgment. The UDP subsequently cross-appealed, challenging the district court's denial of judgment on the pleadings based on assertions of claim preclusion, issue preclusion, and claim splitting, and also the portions of the district court's opinion which purport to invalidate the URP's bylaws and constitution to the extent those provisions conflict with SB54. We consolidated the related appeals, and exercise jurisdiction under 28 U.S.C. § 1291.[4]
III. DISCUSSION
On appeal, this case presents two primary issues. First, the URP challenges the district court's decision to uphold the Either or Both Provision as a constitutional electoral regulation. Second, URP argues that the district court erred in concluding that the number of signatures required in the Signature Requirements for State House and State Senate are not unconstitutionally burdensome. The district court granted summary judgment for the State and against the URP on both these issues pursuant to Rule 56(f). See URP III, 177 F.Supp.3d at 1371 (awarding summary judgment against the URP on the signature requirements under Fed. R. Civ. P. 56(f) ); URP IV, 178 F.Supp.3d at 1188 (awarding summary judgment against the URP on the Either or Both Provision under Fed. R. Civ. P. 56(f) ). On appeal we also address claims raised by the UDP and the conduct of URP counsel Marcus Mumford.
"We review the district court's summary judgment de novo, applying the same standard as the district court," and drawing all reasonable inferences in the light most favorable to the non-moving party. Ellis v. J.R.'s Country Stores, Inc., 779 F.3d 1184, 1191-92 (10th Cir. 2015) (internal citations and quotations omitted). After careful review of the Record and the pleadings, we now AFFIRM the district court's grant of summary judgement for the Lieutenant Governor on both the Either or Both Provision and the Signature Requirements, conclude that the UDP's claims are not ripe for review, and decline to pursue sanctions against Mr. Mumford. Each issue is addressed below.
*1228 A. The Either or Both Provision
Under SB54, a political party that chooses to register as a QPP, and is therefore eligible to maintain its caucus system, must alternatively allow its members the option to "seek the ... party's nomination for any elective office by the member choosing to seek the nomination by either or both of the following methods: (i) seeking the nomination through the [the party's] convention process ... (ii) seeking the nomination by collecting signatures...." Utah Code § 20A-9-101(12)(c) (emphasis added); see also Cox, 373 P.3d at 1287 (Utah 2016) (interpreting that provision to offer the member, rather than the party, the choice). On appeal, the URP argues that this provision is an unconstitutional burden on its freedom of association under the First and Fourteenth Amendments. Aplt. Br. at 32-33 (citing N.Y. State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 202-03, 128 S.Ct. 791, 169 L.Ed.2d 665 (2008) ).
"It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.' " Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (quoting Ill. Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) ). Access to the ballot and the ballot box is the necessary catalyst in the carefully calibrated system of individual freedoms and separation of powers crafted by our founding fathers. Accordingly, we take great care to scrutinize any electoral regulation that would appear to restrict this access.
"It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute," Burdick, 504 U.S. at 433, 112 S.Ct. 2059 (citing Munro v. Socialist Workers Party, 479 U.S. 189, 193, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) ), or that a state may not pass reasonable, nondiscriminatory electoral regulations. The Constitution grants states the right to prescribe "[t]he Times, Places and Manner of Holding Elections for Senators and Representatives," Art I, § 4, cl. 1, and the Supreme Court has held that states enjoy similar authority to regulate their own elections, see, e.g., Tashjian v. Republican Party of Conn., 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). The Court has further recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).
These regulations, however, whether they prescribe the time, place, and manner of elections or otherwise provide for orderly selection of the people's representatives, will invariably impose some burden upon individual voters and political parties. See Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). For example, even a state's decision to close its polls at 7:00 PM instead of 8:00 PM will invariably burden some voters-and therefore their respective parties-for whom the earlier time is inconvenient; so too, however, if the state chose 8:00 PM instead of 9:00 PM. These burdens, then, must necessarily accommodate a state's legitimate interest in providing order, stability, and legitimacy to the electoral process. See Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) ("[I]t is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.") (internal citations omitted).
Amidst this confluence of interests and burdens we analyze electoral regulations using the now-familiar Anderson - *1229 Burdick balancing test. Under Anderson - Burdick,
a court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against the 'precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'
Burdick, 504 U.S. at 434, 112 S.Ct. 2059 (quoting Anderson, 460 U.S. at 789, 103 S.Ct. 1564 ). If, a regulation is found to impose "severe burdens" on a party's associational rights, it must be "narrowly tailored to serve a compelling state interest." Clingman v. Beaver, 544 U.S. 581, 586, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005) (citing Timmons, 520 U.S. at 358, 117 S.Ct. 1364 ). "However, when regulations impose lesser burdens, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.' " Clingman, 544 U.S. at 586-87, 125 S.Ct. 2029 (quoting Timmons, 520 U.S. at 358, 117 S.Ct. 1364 ).
1. The Party's Burdens
This case addresses Utah's electoral regulations contained in SB54 that target the method by which a QPP selects its nominee to appear on the general election ballot for state and federal offices. In this process both the political party and the state have legitimate constitutional interests that need to be balanced. While states play an important role in "structuring and monitoring the election process, including primaries," the political parties also have a First Amendment Right of Association that has to be balanced against the state's interests. Cal. Democratic Party v. Jones, 530 U.S. 567, 572, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000). It is through primary elections that a "party's positions on the most significant public policy issues of the day" are often determined, and it is a party's "nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views." Id. at 575, 120 S.Ct. 2402. The URP argues that SB54 infringes on its First Amendment associational rights by forcing it to adopt a candidate-selection process different from that which it would prefer. However, the Supreme Court has recognized that when political parties become involved in a state-administered primary election, the state acquires a legitimate interest in regulating the manner in which that election unfolds-subject only to the same interest-balancing that occurs throughout the Court's electoral jurisprudence.
The distinction between wholly internal aspects of party administration on one hand and participation in state-run, state-financed elections on the other is at the heart of this case. When a party selects its platform, its Chairman, or even whom it will endorse in the upcoming election, the state generally has no more interest in these internal activities than in the administration of the local Elks lodge or bar association. But when the party's actions turn outwards to the actual nomination and election of an individual who will swear an oath not to protect the Party, but instead the Constitution, and when the individual ultimately elected has the responsibility to represent all the residents in his or her district, the state acquires a manifest interest in that activity, and the party's interest in such activity must share the stage with the state's manifest interest. The dissent blurs this distinction between the party's internal and external activity.[5]
*1230 The Supreme Court's jurisprudence has consistently reflected this difference between a party's internal mechanisms and its external manifestations.
A political party has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform. These rights are circumscribed, however, when the State gives the party a role in the election process-as New York has done here by giving certain parties the right to have their candidates appear with party endorsement on the general-election ballot. Then ... the State acquires a legitimate governmental interest in ensuring the fairness of the party's nominating process, enabling it to prescribe what that process must be.
N.Y. State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 202-03, 128 S.Ct. 791, 169 L.Ed.2d 665 (2008) (internal citations omitted).
Lopez Torres may be a relatively modern case, but the Supreme Court's recognition of the state's vital regulatory role in primary elections is hardly a recent development. As early as 1941 the Supreme Court held that state-administered primary elections, as a "necessary step in the choice of candidates for election as representatives[,]" are subject to congressional and state regulation. United States v. Classic, 313 U.S. 299, 319-20, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). As our country grappled with the scourge of racial and economic discrimination at the ballot box, the Supreme Court consistently intervened in the so-called " White Primary Cases" to recognize that primary elections-or even pre-primary party activity that restricted access to the primary ballot-were sufficiently "state action" to trigger application of the Reconstruction Amendments. See Terry v. Adams, 345 U.S. 461, 469-70, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) ; Smith v. Allwright, 321 U.S. 649, 663-64, 64 S.Ct. 757, 88 L.Ed. 987 (1944).
To be sure, the " White Primary" cases do not stand for the proposition that the "processes by which political parties select their nominees are ... wholly public affairs that States may regulate freely." Jones, 530 U.S. at 572-73, 120 S.Ct. 2402. Nor do we suggest that a party's decision to restrict its primary to only convention delegates via the caucus approach is anywhere near the overt discrimination at issue in those cases. Rather our consideration of those cases extends only insomuch as they indicate that a party's external activities in selecting candidates for public office must necessarily be subject to greater state involvement and scrutiny than its wholly internal machinations.[6]
*1231 In recognition of the state's role in ensuring a democratic and fair primary election the Supreme Court has called it "too plain for argument ... that the State may ... insist that intraparty competition be settled before the general election by primary election or by party convention." Am. Party of Tex. v. White, 415 U.S. 767, 781, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). Then, in 2000, the Court elaborated further, ruling that "a state may require parties to use the primary format for selecting their nominees, in order to assure that intraparty competition is resolved in a democratic fashion." Jones, 530 U.S. at 572, 120 S.Ct. 2402 (citing White, 415 U.S. at 781, 94 S.Ct. 1296 ). All told, by the time Lopez Torres arrived in 2008, the Court considered the issue settled, mentioning in passing: "To be sure, we have ... permitted States to set their faces against 'party bosses' by requiring party-candidate selection through processes more favorable to insurgents, such as primaries." 552 U.S. at 205, 128 S.Ct. 791.
We recognize that each of these statements, while instructive, is technically dicta, but it appears to be clearly established dicta. See Jones, 530 U.S. at 594, 120 S.Ct. 2402 (Stevens, J., dissenting) ("I think it clear-though the point has never been decided by this Court-'that a State may require parties to use the primary format for selecting their nominees.' ") (quoting majority). We are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." Gaylor v. United States, 74 F.3d 214, 217 (10th Cir. 1996) (internal citations omitted). This principle is especially relevant where, as here, the dicta has been explicitly reaffirmed several times, across multiple different eras, by Justices both in support and in dissent. See Tashjian v. Republican Party of Conn., 479 U.S. 208, 237, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (Scalia, J., dissenting) (basing argument on "the validity of the state-imposed primary requirement" because the Supreme Court has "hitherto considered [that validity] 'too plain for argument' "). Finally, if we were hesitant to follow this dicta, we could perhaps be persuaded by our own circuit having favorably cited-without relying-on this very language as early as 1988. See Rainbow Coal. of Okla. v. Okla State Election Bd., 844 F.2d 740, 745 n.7 (10th Cir. 1988) (noting that "the Supreme Court has pointed out 'that the State may ... insist that intraparty competition be settled before the general election by primary election or by party convention' ").[7] In short, we are unwilling to ascribe to so many jurists the contention that their reliance on this dicta was "completely assumed and unreasoned." See Dissent at 1262.
Furthermore, even beyond this consistent dicta, the Supreme Court has explicitly upheld a State's ability to regulate the scope of a party primary. In Clingman v. Beaver, the Court considered the constitutionality of an Oklahoma law restricting *1232 the right to vote in party primary elections to voters who were registered as either independents or as members of the party. 544 U.S. at 584, 125 S.Ct. 2029. There, a party that wanted to open its primary to all registered voters sued, and the Court found that the restrictive regulation only "minimally" burdened the party. Id. at 590, 125 S.Ct. 2029. The Court so held because "Oklahoma's law does not regulate the [party's] internal processes, its authority to exclude unwanted members, or its capacity to communicate with the public." Id.
The same could be said of SB54. SB54 does not regulate the party's internal process; in fact its grand compromise was to maintain the URP's traditional caucus system as a path onto the primary ballot. Furthermore, because the First Lawsuit excised the Unaffiliated Voter Provision, the law no longer proscribes the URP's authority to exclude unwanted members from its primary. Finally, nothing in SB54 prevents the URP from endorsing the candidate of its choice and using traditional advertising channels to communicate that endorsement to the state's voters. Contra Eu v. S.F. Cty. Democratic Cent. Comm., 489 U.S. 214, 222-29, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (invalidating a California ban on primary endorsements). In light of the Supreme Court's recent and consistent dicta, as well as its holding in Clingman, we see no choice but to find the Either or Both Provision only minimally burdensome on the URP.
As a final salvo, however, the URP argues that the Either or Both Provision imposes severe burdens on its associational rights because it leaves the party vulnerable to being saddled with a nominee with whom it does not agree. See Aplt. Br. at 40. We are not so persuaded.
First and foremost, this case is not, as the dissent would suggest, about who the candidates are, but rather who the deciders are. SB54 was not designed to change the substantive candidates who emerged from the parties, but rather only to ensure that all the party members have some voice in deciding who their party's representative will be in the general election. SB54's goal was to ensure only that the will of all the URP was not being truncated by an overly restrictive and potentially unrepresentative nominating process.
Balancing the State's interests against the interests of an association requires us to define the association with the requisite specificity. Here, where the argument is that SB54 may lead to a party nominating a candidate with whom it may not agree,[8] the question before this Court is whether the burdens imposed on the URP by SB54 are minimal or severe. See Aplt. Br. at 31 (defining the first step of the Anderson - Burdick test as whether the law burdens a "political party's constitutional rights."). Put another way, our task today is to analyze SB54's burdens on the Utah Republican Party, or, put still differently, the *1233 group of like-minded individuals in Utah who have joined together under the banner of the Republican Party-rather than just the leadership of the party.
The URP, like all political parties, has "a right to identify the people who constitute the association, and to select a standard bearer who best represents the party's ideologies and preferences." Eu, 489 U.S. at 224, 109 S.Ct. 1013 (internal citations and quotations omitted) (emphasis added). That is why the district court declared the Unaffiliated Voter Provision, which forced the URP to allow nonmembers to help select its candidates, unconstitutional in the First Lawsuit. URP II, 144 F.Supp.3d at 1280.
But now that the Unaffiliated Voter Provision has been excised from SB54, the URP is no longer in danger of fielding a general election candidate who does not enjoy the support of at least a plurality of the voting members of the Utah Republican Party.[9] It is true, as has happened since the passage of SB54, in fact,[10] that the eventual nominee may not enjoy the support of a plurality of the roughly 3,500 party delegates that comprise the URP's caucus electorate. But that failure does not implicate the associational rights of the party , which consists of the roughly 600,000 registered Republicans in Utah, and which is not limited to the party-convention-delegates.
The party leaders and convention delegates are still free to communicate to the rest of their party which of the candidates on the primary ballot the leadership supports.[11] But if the URP wants to open its doors to roughly 600,000 people across the state of Utah, the associational rights of the party are not severely burdened when the will of those voters might reflect a different choice than would be made by the party leadership. To say otherwise is to erroneously conclude that the rights and interests of the association extend only to the rights and interests of the party leadership. See Tashjian, 479 U.S. at 215, 107 S.Ct. 544 ("A major state political party necessarily includes individuals playing a broad spectrum of roles in the organization's activities.").[12] In further support, *1234 we need only look to the Supreme Court for unambiguous direction: "To be sure, we have ... permitted States to set their faces against 'party bosses' by requiring party-candidate selection through processes more favorable to insurgents, such as primaries." Lopez Torres, 552 U.S. at 205, 128 S.Ct. 791.[13]
The unambiguous import of Lopez Torres is that in order to "set their faces against 'party bosses' " states may require primary elections. See id. (emphasis added). This language establishes that the associational rights of a political party expand beyond the party leadership, and would be toothless if party bosses could dictate how candidates can qualify for the primary ballot, perhaps, for example, by requiring candidates to win the support of "party bosses" in order to qualify for the primary ballot, leading to primary "elections" with a single candidate on the ballot. See also Alaskan Indep. Party v. Alaska, 545 F.3d 1173, 1179-80 (9th Cir. 2008) (noting its skepticism that a scheme similar to that at issue in this case imposes a severe burden on a party's associational rights).
Finally, the dissent relies on Jones, but Jones is not contrary to our holding. In that case, the Supreme Court held that states could not force parties to allow nonmembers-"those who, at best, have refused to affiliate with the party, and, at worst, have expressly affiliated with a rival"-to participate in that party's primary election. Jones, 530 U.S. at 577, 120 S.Ct. 2402. Understandably, the Court held that such a "forced association" intruded on the party's First Amendment associational rights. Jones, 530 U.S. at 577, 120 S.Ct. 2402 ; see also Democratic Party of the U.S. v. Wisc. ex rel. La Follette, 450 U.S. 107, 123-24, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981).
But no such burden exists in this case. When SB54 was initially passed, it did contain a significant associational burden in that it forced the party to associate with unaffiliated voters. However, that issue was fought in the first lawsuit, and the URP won. Now the URP's nominee is decided only by those individuals who have chosen to associate with the Party. Following the first lawsuit, SB54 is perfectly compliant with the holding in Jones.
*1235 For these reasons, we conclude that SB54 does not impose a severe burden on the URP by potentially allowing the nomination of a candidate with whom the URP leadership disagrees. Therefore, in recognition of the Supreme Court's repeated and un-recanted dicta, we hold that the Either or Both Provision is at most only a minimal burden on the URP's First Amendment associational rights.[14]
2. The State's Interests
When an electoral provision "places no heavy burden on associational rights," as we hold the Either or Both Provision does not, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." Clingman v. Beaver, 544 U.S. 581, 593, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005) (quoting Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) ). This was the approach adopted by the district court, which upheld the Either or Both Provision relying on the State's important regulatory interests of "managing elections in a controlled manner, increasing voter participation, and increasing access to the ballot." URP IV, 178 F.Supp.3d at 1179 (citing Utah Code §§ 20A-9-401, 2-300.6).[15]
*1236 The State favorably adopted the court's reasoning on appeal, arguing that the Either or Both Provision is a "reasonable regulation furthering the important Utah interests of managing elections in a controlled manner, increasing voter participation, and increasing access to the ballot[.]" Aple's Br. at 34. Furthermore, these interests were not the creation of the district court, but were rather advanced by the State in its motion for summary judgment. Aplt. App. 629 n.91.
The Supreme Court has, in the past, accepted similar articulations of a state's interest in regulating elections. See, e.g., Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 191, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (describing the state interest generally as an interest in "protecting the integrity and reliability of the electoral process"); Clingman, 544 U.S. at 593-94, 125 S.Ct. 2029 (identifying state interests generally as "preserv[ing] political parties" and "enhance[ing] parties' electioneering and party-building efforts"); Timmons, 520 U.S. at 364, 117 S.Ct. 1364 ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes.").
These state interests constitute the very backbone of our constitutional scheme-the right of the people to cast a meaningful ballot. That is one of the rights through which all other rights are protected. In designing our delicate constitutional scheme the founders recognized the importance of representative democracy. They believed it was "essential to liberty that the government in general should have a common interest with the people," and they designed a system in which certain branches of government "have an immediate dependence on, and an intimate sympathy with, the people." The Federalist, No. 52 (James Madison) (Terrance Ball ed., 2003).[16]
Against this backdrop, a survey of the modern political landscape and its decreasing number of truly competitive legislative districts demonstrates that this right can be impaired or even rendered meaningless if not protected at the primary level. Now, more than ever, "we cannot close our eyes to the fact ... that the practical influence of the choice of candidates at the primary may be so great as to affect profoundly the choice at the general election ... and may thus operate to deprive the voter of his constitutional right of choice." Classic, 313 U.S. at 319, 61 S.Ct. 1031. A government that refused to acknowledge its interest in protecting representative democracy during primary elections would be ignoring its solemn obligation to preserve Madison's "sound and important principle that the representative ought to be acquainted with the interests and circumstances of his constituents." The Federalist, No. 56 (James Madison) (Terrance Ball ed., 2003). After all, "a dominant party's primary can determine the representative ultimately elected[,]"
*1237 LULAC v. Perry, 548 U.S. 399, 487, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006) (Breyer, J., concurring in part and dissenting in part), and "[a]s a practical matter, the ultimate choice of the mass of voters is predetermined when the nominations [by the major political parties] have been made." Morse v. Republican Party of Va., 517 U.S. 186, 205-06, 116 S.Ct. 1186, 134 L.Ed.2d 347 (1996) (plurality opinion) (internal quotations omitted) (alteration in original).
Are the voters who only participate in party primaries smarter than those who gather for a caucus or convention? Do they make better choices? Perhaps not. But it is not for us to debate the desirability of their outcomes if the voters are given a fair chance to express their preferences.
3. Balancing the Burden on the Party against the Interests of the State
How could it not be true in a representative democracy such as ours that the State has a strong-even compelling-interest in ensuring that the governed have an effective voice in the process of deciding who will govern them? On balance, then, the State interests in SB54 surely predominate over the minimal burdens imposed upon the URP.[17] Accordingly we AFFIRM the district court's holding that the Either or Both Provision is a constitutional exercise of the State's regulatory authority.[18]
B. The Signature Gathering Requirement
The URP also argues that SB54 is unconstitutional because the signature requirements for State House and State Senate are overly burdensome.[19] Given that the URP's established procedures do not involve a signature-gathering path at all, the URP's preference is clearly to have the signature-gathering path to the primary ballot eliminated all-together. Nonetheless, the crux of the URP's argument challenging this section is that the sheer number of signatures required to access the primary ballot for these two offices is too high a barrier to entry, and thus it unconstitutionally burdens the URP's right of association. Put differently, the URP argues here that the petition requirements established *1238 in SB54 make it too difficult to qualify for the primary ballot for these offices, notwithstanding the fact that the URP would undoubtedly prefer the signature-gathering requirements be so difficult to attain that the only candidates who ever qualified for the primary were the candidates who qualified by winning the URP's caucus.
We pause briefly to note that SB54's severability clause would likely preclude us from striking down the entire law even were we to rule in favor of the URP on this issue, see Utah Code § 20A-1-103, but we nonetheless consider this argument in the alternative, and ultimately conclude that the Signature Requirements-while a burden-are not unconstitutional under the Anderson - Burdick balancing test as applied to the URP.
Any form of candidate eligibility requirement necessarily implicates basic constitutional rights, but as a practical matter "not all restrictions imposed by the States on candidates' eligibility [to appear on the] ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates." Anderson, 460 U.S. at 788, 103 S.Ct. 1564. As we have previously held, a "state has a legitimate interest in requiring a showing of a 'significant modicum of support' before it prints on the state election ballot the name of a political party and its slate of candidates,' " noting that such a requirement "serves the important state interest of avoiding 'confusion, deception, and even frustration of the democratic process[.]' " Artunoff v. Okla. State Election Bd., 687 F.2d 1375, 1378 (10th Cir. 1982) (quoting Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) ). We have further recognized that there is no hard-and-fast rule as to when a restriction on ballot eligibility becomes an unconstitutional burden. See Artnunoff, 687 F.2d at 1379. Instead, candidate eligibility requirements are considered under the Anderson - Burdick balancing test, in which a court is to weigh the character and magnitude of the asserted injury to the plaintiff against the interests advanced by the State as justifications for the eligibility requirements. Anderson, 460 U.S. at 789, 103 S.Ct. 1564.
Under SB54, an individual who wants to follow the signature-gathering path onto a State Senate primary ballot is required to collect 2,000 signatures of registered voters who are residents of the district and permitted by the party to vote for its candidates in a primary election. Utah Code § 20A-9-408(8)(b)(iii). For a candidate for the State House, the requirement is 1,000 signatures. Id § 20A-9-408-(8)(b)(iv). The district court stated that these requirements, considered alone, "may be unconstitutional as applied to the URP." URP III, 177 F.Supp.3d at 1366 ("[T]he signature gathering requirements under Utah Code §§ 20A-9-408(8)(b)(iii) and -408(8)(b)(iv) ... may be unconstitutional as applied to the URP."). Nonetheless, because the court found signature gathering to be only an additional way of accessing the ballot, and the other way to access the ballot-via the convention path-constitutional, the district court did not invalidate the Signature Requirement, nor did it strike down the law as a whole, relying on LaRouche v. Kezer, 990 F.2d 36 (2d Cir. 1993). URP III, 177 F.Supp.3d at 1368.
1. LaRouche v. Kezer
In LaRouche, two candidates for the Democratic nomination for president challenged their inability to qualify for the Connecticut primary election ballot. LaRouche, 990 F.2d at 37. At issue were two Connecticut ballot-access laws. The first, the "media recognition" statute, required the Secretary of State to place on the primary ballot those candidates who are *1239 "generally and seriously recognized according to reports in the national or state news media." Id. (quoting Conn. Gen. Stat. § 9-465(a) (1989) ). The second, the "petition alternative" statute, enabled candidates failing to gain access under the media recognition statute to appear on the ballot "if, within the next fourteen days, they collect signatures from one percent of their party's registered voters." Id. (citing Conn. Gen. Stat § 9-465(b), 9-467 to 469 (1989) ).
The district court in that case examined the two statutes in isolation, ultimately upholding the petition alternative but ruling that the media recognition statute was void for vagueness. LaRouche v. Kezer, 787 F.Supp. 298, 304-05 (D. Conn. 1992). On appeal, the Second Circuit held that the district court had erred in analyzing each statute separately. Rather, the court held, the constitutionality of a state's ballot access provisions should be examined in light of the entirety of the state's comprehensive election code. LaRouche, 990 F.2d at 39 (citing Burdick v. Takushi, 504 U.S. 428, 438-39, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) ; Storer, 415 U.S. at 738-40, 94 S.Ct. 1274 (1974) ; Am. Party of Tex., 415 U.S. at 786-87, 94 S.Ct. 1296 ). From this perspective, the court concluded that:
if the petition alternative would be constitutional standing alone, the additional method of a media recognition test is not in any sense an unconstitutional burden. To the contrary, because it is not constitutionally required, the media recognition test, whether or not vague, increases the opportunities to get on the ballot and reduces the burdens on candidates.... In short, if the district court was correct about the constitutionality of the petition alternative standing alone, then the media recognition statute is a fortiori valid as an additional means of ballot access.
LaRouche, 990 F.2d at 38-39. The court did add, however, that this approach would not save a ballot qualification statute if the statute were "wholly irrational-a coin-flip test, for example[.]" Id. at 38 n.1. The lesson from LaRouche, then, is that, provided it is not wholly irrational, an otherwise unconstitutional ballot-access statute will not be struck down so long as there is an alternative, constitutional, method of accessing the ballot.
We do not in this case need to adopt this as a per se rule. We do, however, agree with the LaRouche court's recognition of Supreme Court precedent-not to mention our own precedent-as requiring us to analyze ballot-access opportunities in sum rather than in isolation. See, e.g., Burdick, 504 U.S. at 438-39, 112 S.Ct. 2059 (finding a ban on write-in voting to be a limited burden "in light of the adequate ballot access afforded under Hawaii's election code."); Artunoff, 687 F.2d at 1379 (holding that the constitutionality of state ballot access laws should be determined only after "due consideration is given to the practical effect of the election laws of a given state, viewed in their totality") (citing Clements v. Fashing, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) ). The lesson we take from LaRouche , then, is that when conducting Anderson - Burdick balancing with regards to state ballot-access laws, due weight should be accorded to whether a challenged provision stands in isolation as the sole method for accessing the ballot, or whether candidates have alternative and constitutionally sufficient paths through which to qualify. In the latter circumstance, the burden that any one particular route to ballot access that the law places on candidates, voters, and parties is necessarily reduced.
2. SB54
Applying this approach to the Utah Election Code, we find that the Signature *1240 Requirement withstands constitutional scrutiny.
SB54 provides two methods for candidates to qualify for the primary ballot for a QPP. First, a candidate may qualify for the primary ballot at the QPP's nominating caucus. Utah Code § 20A-9-407. No party to this lawsuit challenges the constitutionality of this provision, and in fact the URP's primary assertion, as discussed above, is that this should be the only available method for qualifying for the Republican primary ballot. Therefore, we accept that there is at least one constitutional method of ballot access under the Utah election code.
The second method allows a candidate to gain access to the primary ballot by gathering signatures of "registered voters in the state who are permitted by the qualified political party to vote for the qualified political party's candidates in the primary election." Utah Code § 20A-9-408(8). For candidates seeking a place on the ballot for State House, the law requires the collection of 1,000 signatures. Id. at 20A-9-408(8)(b)(iv). For candidates seeking a place on the ballot for State Senate, the required number swells to 2,000. Id. 20A-9-408(8)(b)(iii).[20]
In a perfect example of why it is prudent for legislatures to use ratio requirements as opposed to absolute numbers, the burden imposed by the signature-gathering requirements varies widely from district to district. At the outset of this litigation, a candidate using the signature-gathering path to access the primary ballot for State Senate needed to collect signatures from between 6.21% of registered Republicans (in district 14) and 30.82% of registered Republicans (in district 1) depending on the district in which he or she was running. The numbers are even starker for the State House, where a candidate was required to collect signatures from between 7.14% (in district 27) and 57.2% (in district 26) of the registered Republicans in a given district.[21] The URP argues that these numbers are so high as to severely burden its right of association with potential candidates of its party and cannot be saved as reasonably calculated to serve a compelling state interest. Aplt. Br. at 42-45.
If the signature-gathering path stood alone we would be inclined to agree. Petition requirements are a constitutional method of serving a state's "legitimate interest in requiring a showing of a 'significant modicum of support' " before adding a candidate to an election ballot, Arutunoff, 687 F.2d at 1378 (quoting Jenness, 403 U.S. at 442, 91 S.Ct. 1970 ), but the Supreme Court has not yet approved a requirement greater than 5% of the registered voters in a given election. See Jenness, 403 U.S. at 438, 91 S.Ct. 1970 (upholding a statute requiring a petition signed by 5% of eligible voters in order for an independent candidate to qualify for the general election ballot). We do not *1241 hold that 5% is the outer-boundary of what can pass constitutional muster, but it is likely the limit is at least visible from there. Where, as here, the regulation requires signatures from over 50% of the eligible voters in some districts, we can conclude that the State's legitimate interest in requiring a candidate to show a "modicum" of support no longer outweighs the burden imposed on candidates, parties, and most of all, voters, at least as to those districts.
However, when viewing the Utah Election Code in totality, See Arutunoff, 687 F.2d at 1379, we are not convinced that the burdens imposed by the collection of avenues Utah has created onto a primary ballot unconstitutionally burdens the URP's First Amendment right of association.[22] First, the State has a significant interest in regulating the manner in which a candidate may qualify for an election ballot.
A state has a legitimate interest in requiring a showing of a "significant modicum of support" before it prints on the state election ballot the name of a political party and its slate of candidates. This serves the important state interest of avoiding "confusion, deception, and even frustration of the democratic process at the general election." Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). Furthermore, the states "have important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections." Clements v. Fashing, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982).
Arutunoff, 687 F.2d at 1378. This interest applies with equal force to primary elections as it does to general elections. N.Y. State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 204, 128 S.Ct. 791, 169 L.Ed.2d 665 (2008) ("Just as States may require persons to demonstrate a significant modicum of support before allowing them access to the general-election ballot, lest it become unmanageable, they may similarly demand a minimum degree of support for candidate access to a primary ballot.") (internal citations and quotations omitted). Therefore, for Anderson - Burdick balancing purposes, these "important regulatory interests" will be sufficient to uphold SB54's Signature Requirements provided the burdens imposed by those requirements are less than severe. See Clingman, 544 U.S. at 586-87, 125 S.Ct. 2029.
While the petition requirements standing alone would undoubtedly impose a severe burden as to some districts, we cannot find them burdensome on the party within the context of the electoral scheme as a whole. First, the signature-gathering path is only one possible avenue onto the primary election ballot, and all parties to this lawsuit concede the alternative-advancing from the party's caucus-both is constitutional and would be constitutional standing alone. Therefore, from the URP's perspective, the signature-gathering provision only "increases the opportunities to get on the ballot" thereby reducing the burden placed on the URP and other political parties. See LaRouche, 990 F.2d at 38.
Furthermore, over an objection from the URP, which tried to establish a dispute of material fact, the district court found that notwithstanding the loftiness of these requireme *1242 nts, the signature gathering path remained "a realistic means of ballot access[.]" URP III, 177 F.Supp.3d at 1369 ; see also id. at n.174 ("[T]he URP recognizes that there are at least some URP candidates who have successfully met the signature requirements to obtain access to the ballot."). This also weighs in favor of finding that the burden is less than severe.
Finally, we do recognize that some of these numbers-57%, in one particular house district-are eye-popping. Yet we are struck that the enormity of these figures says more about the compartmentalization of our current political landscape than it does the validity of SB54. The 57% figure comes from House District 26 which was one of only a handful of districts in Utah-an overwhelmingly Republican state-that is packed so full of Democratic voters that Republicans did not even bother fielding a candidate there in the most recent election. In 2014 the Republicans fielded a candidate, but that candidate received just 28% of the votes, compared to 72% for the Democratic candidate.[23] According to data in the Record, in 2016 District 26 had 9,522 registered voters, just 18% of whom were registered Republicans. This in a state where 48% of the registered voters statewide were registered Republicans.
Against this backdrop, it is more likely these eye-popping numbers say more about modern political gerrymandering and segmentation than they do about the constitutionality of SB54. Whether by overt gerrymandering, a growing tendency of people to gravitate towards those who share their politics, or some combination of the two, the percentages imposed by the Signature Requirement in several Utah districts is so high precisely because there are so many Democrats packed into those particular districts that the URP will never actually be able to capture that seat. Where the URP has no reasonable likelihood of fielding or electing a serious candidate in those districts with high percentage requirements of petition signatures, we cannot say the URP has suffered any real injury to its constitutional right of association when it was largely redistricting decisions that caused such anomalies.[24]
When we look at the state's electoral scheme in totality, including the retention of the caucus system as a method of qualifying a candidate for the primary ballot, we conclude that the Signature Requirement does not impose a severe burden on the URP's associational rights. Therefore we hold that Utah's legitimate interest in requiring a candidate to demonstrate a minimum degree of support in terms of gathering 1,000 or 2,000 signatures on a petition before being placed on the primary ballot for the State House or State Senate is sufficient to outweigh the provision's minimal burdens on the URP. Therefore we AFFIRM the district court's ruling that the challenged Signature Requirements do not constitute an unconstitutional burden on the URP.
C. The Utah Democratic Party
At the district court the Utah Democratic Party ("UDP") intervened as a plaintiff in part to "ensure [the State] appl[ies] the laws equally to all Utahns, no matter what political party, if any, they choose to join."
*1243 Aplt. App. 99. The UDP-joined in this instance by the State-argues that the URP's arguments in this lawsuit are barred by the doctrines of claim preclusion, issue preclusion, and claim splitting based on the outcome of the First Lawsuit. Democrats Br. at 17-24; Aple. Br. at 47. Because we hold that the URP's constitutional claims fail, we have no reason to reach the merits of the UDP's cross-appeal from the district court's ruling that the URP's arguments were not so barred.[25]
Additionally, the UDP argues that the district court erred in invalidating portions of the URP's constitution and bylaws that conflict with SB54 as interpreted by the Utah Supreme Court and the district court. Democrats' Br. at 9-10. Specifically, the UDP takes issue with the district court's comment that the "stated URP intention to ban a member from nomination if that member fails to secure at least 40% of the delegate vote at convention is directly contrary to state law and is invalid." See URP IV, 178 F.Supp.3d at 1184. The UDP argues that the district court was powerless to invalidate the URP's bylaws, and the choice of whether to comply with state law (and remain a QPP) or violate state law (and revert to RPP status) should be left with the URP. Democrats' Br. at 11-13. In other words, the UDP argues that the district court should have invalidated the URP's status as a QPP rather than simply striking the offending provisions in the URP bylaws so the URP would remain a QPP.
This is essentially the exact question certified to the Utah Supreme Court by the district court earlier in this litigation. On April 8, 2016, the Utah Supreme Court addressed the following question, certified at the request of the UDP: "If a registered political party (RPP) that has selected to be designated as a Qualified Political Party (QPP) fails to satisfy the requirements of a QPP, must the Lieutenant Governor treat that political party as a RPP under Utah law?" Utah Republican Party v. Cox, 373 P.3d 1286, 1287 (Utah 2016). The Utah Supreme Court declined to answer that question, concluding that it was not yet ripe for review. Id. We agree.
Drawing its application both from "Article III limitations on judicial power" and "prudential reasons for refusing to exercise jurisdiction," Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 670 n.2, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010), "[t]he ripeness doctrine aims to prevent courts from entangling themselves in abstract disagreements by avoiding premature adjudication." Awad v. Ziriax, 670 F.3d 1111, 1124 (10th Cir. 2012) (internal quotations omitted). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " Texas v. United States, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) ). Prudential ripeness is traditionally considered through the two-prong test established in Abbott Labs. v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), under which courts assess (1) "the fitness of the issues for judicial decision[,]" and (2) "the hardship to the parties of withholding court consideration." See, e.g., Fourth Corner Credit Union v. Fed. Reserve Bank of Kan. City, 861 F.3d 1052, 1059 (10th Cir. 2017) (Matheson, J., concurring) (quoting United States v. White, 244 F.3d 1199, 1202 (10th Cir. 2001) ).
In declining to answer the certified question, the Utah Supreme Court noted *1244 that it was as yet unclear whether the URP, if it were to lose its challenge to SB54's constitutionality, would enforce its constitution and bylaws. Utah Republican Party, 373 P.3d at 1288 ("At present there are multiple options available to the Republican Party once this court's interpretation of the QPP statute is published, and it is not clearly established in the record which of those the party will choose."). In assessing the record before us, we find that nothing has changed in this respect. As the Utah Supreme Court observed, the URP has offered conflicting statements during the course of this litigation about its intention to comply with SB54. Compare id. at 1288 ("The Chairman of the Utah Republican Party sent a letter to the Lieutenant Governor in December 2015 declaring that 'it would restrict its candidate-selection procedures to the convention method, thereby prohibiting any URP candidate from gathering signatures.' ") with id. at 1288-89 ("More recently, however, counsel for the Republican Party [stated that] 'if the state law says that we have to allow both routes and if that is what the Supreme Court decides and if we have elected to be a QPP, then we would have to figure a way how to change our constitution and by-laws to conform to the state law.' ").
Against this backdrop, the doctrine of ripeness counsels that it is premature for this Court to determine the appropriate remedy should the URP flout the dictates of SB54. Considering first the "fitness of the issues for judicial decision," Abbott Labs., 387 U.S. at 149, 87 S.Ct. 1507, we find that the UDP's cross-appeal is littered with uncertainty. Perhaps, following the conclusion of this lawsuit, the URP will expel members who choose to pursue the primary ballot through the signature-gathering process. Doing so would violate state law under the Utah Supreme Court's interpretation of the Either or Both provision, and the question of what remedy is appropriate would thus ripen for review. Perhaps the URP will decline to enforce its bylaws, in which case the UDP's claim of hardship would become moot.[26] Perhaps the URP will voluntarily amend its constitution and bylaws in response to this litigation prior to the 2018 election, which will again moot this question. Given this uncertainty, we cannot conclude that the issue of what remedy is appropriate when a political party's constitution and bylaws contravene state law is prudently fit at this time for judicial consideration before this court.[27]
As for the second prong, "the hardship to the parties of withholding court consideration," id., we do not find that the UDP will be significantly impaired by our decision here today. By declining to address the remedy of a violation which may never *1245 occur, we simply maintain the status quo. Accordingly, we find that the Democrats' alleged injury is not ripe for review.
D. URP Attorney Marcus Mumford
Finally we address the conduct of Mr. Marcus Mumford, an attorney for the URP. After he repeatedly missed deadlines at the Tenth Circuit, a panel of our colleagues took the extraordinary step of placing Mr. Mumford on notice that "the judges assigned to decide this appeal on the merits may wish to address in greater depth counsel's noncompliance with the court's rules." Utah Republican Party v. Cox, No. 16-4091, Order Granting Appellant's Motion to Accept Late Brief (Dec. 16, 2016).
Mr. Mumford triggered this notice through a series of procedural and timeliness violations in the submission of his opening brief. First, the brief did not satisfy this Court's rules, in that it did not state the opposing party's position on the relief requested as required by Tenth Circuit Rule 27.1. Second, Mr. Mumford failed to comply with Tenth Circuit Rule 31.5 by not providing this Court with hard copies of his brief within two business days of the brief having been filed electronically.
Our colleagues-correctly, in our opinion-noted but did not linger on these errors. More troubling, however, was Mr. Mumford's repeated inability to file papers in a timely manner. Rather than paraphrase the extensive timeliness problems associated with this brief, we simply incorporate our colleagues' findings:
The opening brief was originally due September 27, 2016. The appellant requested and was granted an extension of time to file the opening brief until October 27, 2016. The appellant then requested a 96-day extension of time to file the opening brief, or until January 31, 2017. At the direction of the court, the appellant was granted a portion of the requested extension. We allowed 30 additional days to file the opening brief, which pushed the filing deadline to November 28, 2016. The court advised that no additional extensions of time to file the opening brief would be granted.
On November 28, 2016, the appellant electronically filed a four volume appendix. No opening brief was submitted with the appendix, however. Two days later, having received no opening brief, the court issued a deficiency notice to the appellant regarding the missing brief. The court sua sponte granted 10 additional days to file the opening brief. The opening brief was due December 12, 2016.
With the additional time provided by operation of the deficiency notice and an intervening weekend, the appellant had 14 additional days beyond the final extension deadline to file the opening brief. But even with all of this additional time, the appellant still did not file the opening brief on the due date. The brief was due December 12, 2016, but was not filed until the morning of December 13, 2016. Compounding the problem further is the fact that the [Motion to Accept Late Brief] was not filed until December 14, 2016, two days after the deadline set in the deficiency notice expired.
Utah Republican Party v. Cox, No. 16-4091, Order Granting Appellant's Motion to Accept Late Brief (Dec. 16, 2016). Notwithstanding these errors, our colleagues tolerantly excused the untimely submission and granted the Motion to Accept Late Brief, albeit with the language regarding Mr. Mumford quoted above. Id. [28]
*1246 Like our colleagues, we are troubled by this pattern of untimeliness. If it were to continue in future appeals we might be forced to consider taking action against Mr. Mumford. While at this time we do not feel his conduct has risen to the level necessary to support such drastic sanctions, he would be well-served to approach his next foray into our courthouse with a keen attention to timeliness and detail.
IV. CONCLUSION
States must have flexibility to enact reasonable, common-sense regulations designed to provide order and legitimacy to the electoral process. SB54, as modified in the First Lawsuit, strikes an appropriate balance between protecting the interests of the state in managing elections and allowing the URP and all other political associations and individuals across Utah to express their preferences and values in a democratic fashion and to form associations as protected by the First Amendment to the Constitution. Not only does this balance not offend our Constitution, it is at its very essence. Accordingly, we AFFIRM.

In Utah, the Lieutenant Governor administers the state election process.

For the State House and State Senate these numbers are 1,000 and 2,000 respectively. Utah Code § 20A-9-408(8) (ii-iii) (the "Signature Requirement"). Those are the only two offices for which the Signature Requirement's constitutionality is at issue in this appeal. By contrast, the Either or Both provision, the constitutionality of which we also address in this appeal, applies to more than these two offices, and our consideration of that provision applies equally to all candidates and offices covered by SB54.

The first lawsuit is, however, relevant to the present appeal in part because the URP argues the State took positions during that lawsuit that it should be judicially estopped from retracting in this action.

Upon initial review it was unclear whether all claims before the district court had been adjudicated to finality. See 28 U.S.C. § 1291 (restricting appellate review to "final" decisions from the district court). After we received supplemental briefing, it became clear to us that all issues had been ruled upon, dismissed as moot, or mooted by the district court's rulings, so there was a final decision below.

See Richard H. Pildes, The Constitutionalization of Democratic Politics, 118 Harv. L. Rev. 28, 107, 107 n.323 (2004) ("[C]ourts must engage in direct, functional analysis of the role of parties and primaries in American democracy. That analysis is not furthered by reasoning analogically from the Jaycees, the Boy Scouts, the Mormons, or similar religious or civil-society entities.").

To use the dissent's example, the process by which parishioners choose their priest has no external application. See Dissent at 1252-53. A priest does not appear on a state-run, state-financed ballot, and if a priest is successful in an election his duty is to his parish and his faith, not the broader citizenry of the state or district. The state has no interest, then, in the process by which that priest is chosen. But the URP is not a parish or a club, but rather a political association whose activities run the gamut from purely internal-such as voting on the party platform-to a hybrid internal-external-such as nominating candidates who will appear on the general election ballot in the hopes of being elected to represent not the URP, but the broader citizenry of Utah. The entire point of the Supreme Court's jurisprudence in this area is to recognize that the state's ability to regulate the association is not the same in the second instance as it is in the first.

We are hardly alone in recognizing the weight of this dicta. See, e.g., Alaskan Indep. Party v. Alaska, 545 F.3d 1173, 1178 (9th Cir. 2008) (relying on this dicta to uphold a primary scheme similar to the one at issue here); Cool Moose Party v. Rhode Island, 183 F.3d 80, 83 n.4 (1st Cir. 1999) (suggesting based on White that a mandatory primary is constitutional); Lightfoot v. Eu, 964 F.2d 865, 872 (9th Cir. 1992) (upholding a mandatory primary in part based on dicta from White ); Az. Green Party v. Bennett, 20 F.Supp.3d 740, 748 (D. Ariz. 2014) (citing favorably to Jones to establish that a party could not insist on using a nominating convention to avoid a burdensome state law); Greenville Cty. Republican Party Exec. Comm. v. South Carolina, 824 F.Supp.2d 655, 666 n.7 (D. S.C. 2011) (relying on White for proposition that a state may "mandate that a single nomination method be used by all candidates and political parties").

This is not to suggest that we disagree with the dissent's observation that "[p]olitical science literature has long observed parties have several components, only one of which is their membership." Dissent at 1256. But in this context, in which the question is whether the party is being forced to associate with individuals with whom it may not agree, the Supreme Court has instructed that the relevant "Party" is the collection of party members. In Jones, the Supreme Court distinguishes between "party leadership['s]" ability to endorse a candidate and "party members'" ability to choose a nominee. 530 U.S. at 580, 120 S.Ct. 2402. This distinction makes clear who the Jones majority is referring to when it references "the party" in the final sentences of the two ensuing paragraphs: "In any event, the ability of the party leadership to endorse a candidate does not assist the party rank and file, who may not themselves agree with the party leadership, but do not want the party's choice decided by outsiders.... There is simply no substitute for a party's selecting its own candidates." Id. at 581, 120 S.Ct. 2402 (emphasis added).

The Court is aware that under the new process, unlike under the old-in which no more than two candidates could advance from the URP convention to the primary ballot-the URP's general election candidate could potentially receive a plurality, rather than a majority, of votes in the primary election. The Court recognizes the party's interest in avoiding this outcome. However, while this interest was mentioned at Oral Argument, it was not included in the argument section of the URP's brief, and we "routinely have declined to consider arguments that are not raised, or are inadequately presented in an appellant's opening brief." Bronson v. Swensen, 500 F.3d 1099, 1104 (10th Cir. 2007). Furthermore, even if we do consider this newly advanced interest, we find that, in light of this country's historic recognition of the legitimacy of plurality-based elections, the additional burden this imposes on the URP is, at most, minimal. Cf. Whitcomb v. Chavis, 403 U.S. 124, 160, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) ("[W]e are unprepared to hold that district-based elections decided by plurality vote are unconstitutional....").

See John Verhovek, Saisha Talwar, and Adam Kelsey, Moderate mayor wins republican primary to replace Rep. Chaffetz in Utah, ABCNews.com, Aug. 15, 2017, http://abcnews.go.com/Politics/utahs-special-election-primary/story?id=49216793.

The URP may still communicate that information using the traditional channels of political advertising.

We also note that, in its Complaint filed in this lawsuit, the URP repeatedly referred to SB54 as burdening the rights of "the Party and its members." See, e.g., Aplt. App. at 26 ("The First and Fourteenth Amendments to the United States Constitution guarantee to the Party and its members the right to associate in a political party[.] ... These are core Constitutional freedoms held individually and collectively by the members of the Utah Republican Party, and by the Party itself.") (emphasis added). This accords with how the Supreme Court has identified the constitutional right of association as it relates to a political party. See Norman v. Reed, 502 U.S. 279, 288, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992) ("For more than two decades, this Court has recognized the constitutional right of citizens to create and develop new political parties. The right derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their political preferences.").

The dissent cites to Eu , Dissent at 1256-57, as a case where, according to the dissent, the Supreme Court draws a distinction between the "Party" and its "members." However that is not an accurate reading of Eu . It is true that in Eu the Court uses the phrase "the parties and their members," but that phrase is used inclusively rather than drawing a distinction between a party and its members. 489 U.S. at 232, 109 S.Ct. 1013. The rights of "the Party and their members" emphasizes the unity of the Party and its members rather than attempting to draw a distinction between them. See also Timmons, 520 U.S. at 351, 117 S.Ct. 1364.
Eu is also distinguishable in that it dealt primarily with the issue of a political party in the speech, as opposed to associational, context. Party leadership may enjoy different First Amendment speech rights than do individual members. Jones itself discusses this distinction. 530 U.S. at 580, 120 S.Ct. 2402 ("The ability of the party leadership to endorse a candidate [speech context] is simply no substitute for the party members' ability to choose their own nominee [associational context]."). This line leaves little doubt that the scope of a political organization includes its members.

While the dissent can speculate that SB54 "interferes with the Party's internal procedures, changes the kinds of nominees the Party produces (is, in fact, meant to do so), allows unwanted candidates to obtain the Party nomination, causes divisiveness within the Party, and reduces the loyalty of candidates to the Party's policies[,]" Dissent at 1254, we believe that is simply not an accurate representation of the record before us.

The dissent attempts to equate the motives of an advocacy group, Count My Vote ("CMV") with that of the Utah legislature. See, e.g., Dissent at 1248, 1253, 1254-55, 1259-60. The problem with this approach is that in discerning legislative intent we look not to the motive of advocacy groups, lobbyists, or even individual legislators, but the legislature as a whole. So let's talk about the legislature. First, a substantial majority of the members of the Utah legislature are members of the URP. Second, if we were to look to advocates rather than legislators, all indications are that CMV's goal was not to determine who won the URP's nomination, but rather how that nominee was selected. Finally, the record reflects that the Utah legislature was motivated to preserve a representative and fair process rather than focusing on the specific outcome of the process.
Let's step back for a minute and reflect on what really happened. The process that led to SB54 is certainly not determinative to our outcome, but it may be informative. On one hand, the URP wanted to preserve its traditional caucus and convention system, which was susceptible to strong influence by Party leadership. On the other hand, CMV wanted a mandatory primary, which would entirely eliminate the URP's preferred system. CMV had a powerful piece of ammunition in its arsenal in that it was threatening to take its idea to the voters directly via a ballot initiative, and apparently the Republican majority in the state legislature gave credence to that possibility. Thus was born the "Grand Compromise" where both sides got something they wanted. The Party received the assurance that the nominee it selected through its preferred caucus system would appear on the primary ballot. CMV ensured that all party members had the opportunity to play a meaningful role in selecting their Party's nominee through a direct primary vote. And URP leadership still retained the ability to advise the party membership as to who they endorsed and to advertise and campaign for their preferred candidate. And who, perhaps, was the biggest winner of this compromise? It was the heart and soul of the Republican Party: its members writ large. They were given the right to ensure that they, the URP, could decide with whom they wanted to associate on the general election ballot. This compromise illustrates the best aspects of representative democracy and honors the diverse interests that make up any political subdivision or district. See Robert Gehrke, Senate advances bill that would nullify Count My Vote initiative, Salt Lake Tribune, http://archive.sltrib.com/article.php?id=57575253 & itype=CMSID (Feb. 20, 2014, 6:08PM) (last visited, Feb. 28, 2018); Robert Gehrke, It's back on: Legislators, Count My Vote renew deal on election reform, Salt Lake Tribune, http://archive.sltrib.com/article.php?id=57619746 & itype=CMSID (March 2, 2014, 9:44AM) (last visited, Feb. 28, 2018).

See also Spencer Overton, Voter Identification, 105 Mich. L. Rev. 631, 657 (2007) (explaining that "widespread participation" is a "crucial democratic value" for four reasons: (1) exposing decision-makers to new ideas and viewpoints, (2) ensuring democratic legitimacy, (3) redistributing government resources and priorities to reflect evolving problems and needs, and (4) furthering self-fulfillment and self-definition of individual citizens); Frances R. Hill, Putting Voters First: An Essay on the Jurisprudence of Citizen Sovereignty in Federal Election Law, 60 U. Miami L. Rev. 155, 156-57 (2006) ("The concept of consent as suggested by the first sentence of the Constitution is not limited to the single act of ratifying the Constitution, but rather is a process of continuing consent, expressed through continuing participation. Such participation is the foundation of representative government.").

The Ninth Circuit, presented with a similar law establishing a mandatory primary at the expense of a party-nominating convention, held that the law survived even strict scrutiny because it was narrowly tailored to advance the compelling state interest of "eliminating the fraud and corruption that frequently accompanied party-run nominating conventions." Alaskan Indep. Party v. Alaska, 545 F.3d 1173, 1180 (9th Cir. 2008). We have no occasion to assess whether SB54 could similarly survive strict scrutiny, but find that case nonetheless instructive in our assessment that SB54's similar restrictions can survive much less intensive scrutiny.

The URP also argues that the State should be judicially estopped from taking the position that the candidate, not the party, is able to decide whether to seek the nomination through the convention or through submitting signatures. Aplt. Br. at 48-50. Its argument is based on a colloquy between the judge and counsel for the State in the First Lawsuit. After reading the exchange, Aplt. App. 345-47, the Court is not left with the impression that the position advanced by the State in the First Lawsuit is "clearly inconsistent" with the position it advances now, see Hansen v. Harper Excavating, Inc., 641 F.3d 1216, 1227 (10th Cir. 2011). For this reason, not to mention the URP's failure to cite to the Record in the argument section of its brief, see Fed. R. App. P. 28(a)(8)(A), we AFFIRM the district court's decision not to apply judicial estoppel.

While SB54 establishes varying signature requirements to access the primary ballot for all elections, the district court only discussed the potential unconstitutionality of the requirements for two offices: State House and State Senate. URP III, 177 F.Supp.3d 1343, 1365 (D. Utah 2016). Therefore we restrict our consideration of the signature requirements to the requirements established for those two offices.

When it drafted these figures the Utah legislature expected the pool of available signatories to be roughly twice as large as it currently stands, thereby reducing the required percentages by approximately half. After the district court struck down the Unaffiliated Voter Provision in the First Lawsuit, however, the pool of registered voters permitted to vote in a Republican primary election-the pool of available signatories for a Republican candidate-dropped by nearly 46% statewide as unaffiliated voters were no longer eligible to sign a candidate's petition. As of November 27, 2017, there were 603,195 registered unaffiliated voters in Utah, and 715,983 registered Republicans. Utah Lieutenant Governor Elections, Voters by Party and Status , www.elections.utah.gov/party-and-status (last visited 11/27/2017).

These figures are drawn from the Record as it existed when the URP filed for summary judgment on this issue on February 2, 2016. See Aplt. App. 431-435.

Our analysis here is confined to the question of whether the Signature Requirement constitutes an unconstitutional burden on the URP. Because the litigants are political parties and not candidates, we do not address the burdens imposed on individual candidates.

Utah Lieutenant Governor Elections, Election Results, https://elections.utah.gov/election-resources/election-results, (last visited Nov. 27, 2017).

Nonetheless, this lawsuit demonstrates why states would be prudent to use percentages, rather than absolute totals, when requiring candidates to obtain signatures in order to qualify for the ballot. That way, as voter populations ebb and flow and partisan compositions change district-by-district, the amount of support necessary to demonstrate viability remains the same. This is the traditional method, and one we strongly encourage states to adopt moving forward.

In so doing we also express no opinion on the URP's claim that these arguments necessarily fail under Rule 28(i) and the "cross-appeal" rule. See Aplt. Reply at 25-27 (citing Fed. R. App. P. 28(i) and Bernstein v. Bankert, 733 F.3d 190, 224 (7th Cir. 2013) ).

It is possible that if the URP leaves its bylaws and constitution intact but simply refuses to enforce them, there may be some hardship to individual candidates or the UDP by virtue of the chilling effect those bylaws would have on potential candidates. This issue was not raised by the parties, however, and thus we decline to address it. The UDP's claims were dismissed by the district court without prejudice, Aplt. App. 1203-04, thus if it would like to renew this claim of hardship at a later date, it is free to do so.

The Court does take judicial notice of the fact that multiple Utah Republican candidates have qualified for primary election ballots using the signature-gathering method-including the current Republican Governor-and have not been expelled from the Party. See, e.g., Ben Winslow and Mark Green, Gov. Gary Herbert forced into primary election with Jonathan Johnson , Fox 31 Salt Lake City , (April 23, 2016) http://fox13now.com/2016/04/23/gov-gary-herbert-forced-into-primaryelection-with-jonathan-johnson/ ("Because he gathered signatures under the "Count My Vote" compromise law, Herbert has a guaranteed spot on the ballot, despite failing to secure the convention nomination.").

We also note that similar tardiness on Mr. Mumford's part in the First Lawsuit led that court to order Mr. Mumford to add co-counsel due to his "demonstrated inability to manage deadlines and because of his repeated failure to comply with court orders throughout this case[.]" Utah Republican Party v. Herbert, No. 2:14-CV-00876-DN-DBP, 2015 WL 6394534, at *7 (D. Utah Oct. 22, 2015).